In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1286

AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS,

*Plaintiff-Appellant,*

*v.*

ANITA ALVAREZ,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 5235—**Suzanne B. Conlon**, *Judge.*

ARGUED SEPTEMBER 13, 2011—DECIDED MAY 8, 2012

Before POSNER, SYKES, and HAMILTON, *Circuit Judges.*

SYKES, *Circuit Judge.* The Illinois eavesdropping statute makes it a felony to audio record "all or any part of any conversation" unless all parties to the conversation give their consent. 720 ILL. COMP. STAT. 5/14-2(a)(1). The statute covers any oral communication regardless of whether the communication was intended to be private. *Id.* 5/14-1(d). The offense is normally a class 4 felony but is elevated to a class 1 felony—with a possible prison

term of four to fifteen years—if one of the recorded individuals is performing duties as a law-enforcement officer. *Id.* 5/14-4(b). Illinois does not prohibit taking silent video of police officers performing their duties in public; turning on a microphone, however, triggers class 1 felony punishment.

The question here is whether the First Amendment prevents Illinois prosecutors from enforcing the eavesdropping statute against people who openly record police officers performing their official duties in public. More specifically, the American Civil Liberties Union of Illinois ("ACLU") challenges the statute as applied to the organization's Chicago-area "police accountability program," which includes a plan to openly make audio-visual recordings of police officers performing their duties in public places and speaking at a volume audible to bystanders. Concerned that its videographers would be prosecuted under the eavesdropping statute, the ACLU has not yet implemented the program. Instead, it filed this preenforcement action against Anita Alvarez, the Cook County State's Attorney, asking for declaratory and injunctive relief barring her from enforcing the statute on these facts. The ACLU moved for a preliminary injunction.

Faced with so obvious a test case, the district court proceeded with some skepticism. The judge dismissed the complaint for lack of standing, holding that the ACLU had not sufficiently alleged a threat of prosecution. The ACLU tried again, submitting a new complaint addressing the court's concerns. This time, the judge held

that the ACLU had cured the original defect but had "not alleged a cognizable First Amendment injury" because the First Amendment does not protect a "right to audio record." The judge denied leave to amend. The ACLU appealed.

We reverse and remand with instructions to allow the amended complaint and enter a preliminary injunction blocking enforcement of the eavesdropping statute as applied to audio recording of the kind alleged here. The Illinois eavesdropping statute restricts a medium of expression commonly used for the preservation and communication of information and ideas, thus triggering First Amendment scrutiny. Illinois has criminalized the nonconsensual recording of most any oral communication, including recordings of public officials doing the public's business in public and regardless of whether the recording is open or surreptitious. Defending the broad sweep of this statute, the State's Attorney relies on the government's interest in protecting conversational privacy, but that interest is not implicated when police officers are performing their duties in public places and engaging in public communications audible to persons who witness the events. Even under the more lenient intermediate standard of scrutiny applicable to content-neutral burdens on speech, this application of the statute very likely flunks. The Illinois eavesdropping statute restricts far more speech than necessary to protect legitimate privacy interests; as applied to the facts alleged here, it likely violates the First Amendment's free-speech and free-press guarantees.

## I. Background

### A. The Illinois Eavesdropping Law

In 1961 the Illinois General Assembly enacted a law making it a crime to use "an eavesdropping device to hear or record all or part of any oral conversation without the consent of any party thereto." 1961 Ill. Laws 1983. The statute defines "eavesdropping device" as "any device capable of being used to hear or record oral conversation." *Id.* (codified at 720 ILL. COMP. STAT. 5/14-1(a)); *see also* Celia Guzaldo Gamrath, *A Lawyer's Guide to Eavesdropping in Illinois*, 87 ILL. B.J. 362, 363 (1999) (discussing the history of the Illinois eavesdropping law). The legislature later amended the law to require the consent of "all of the parties" to the conversation. Ill. Pub. Act 79-1159 (1976) (codified at 720 ILL. COMP. STAT. 5/14-2(a)(1)).

In *People v. Beardsley*, 503 N.E.2d 346, 349-50 (Ill. 1986), the Illinois Supreme Court adopted a narrow interpretation of the eavesdropping statute, declaring that audio recordings were prohibited only if the circumstances "entitle [the conversing parties] to believe that the conversation is private and cannot be heard by others who are acting in a lawful manner." In other words, recording a conversation was punishable under the eavesdropping statute *only if* the conversing parties had an "expectation of privacy," though the court remarked that the expectations of privacy protected under the statute were not necessarily "coextensive with those imposed on governmental action by the fourth amendment." *Id.* at 351.

Eight years later the state supreme court reaffirmed its *Beardsley* decision in *People v. Herrington*, 645 N.E.2d 957 (Ill. 1994). The court held that "there can be no expectation of privacy by the declarant where the individual recording the conversation is a party to that conversation." *Id.* at 958. Chief Justice Bilandic dissented, arguing that normal privacy expectations include an assumption that most conversations are not being recorded. *Id.* at 959-60 (Bilandic, C.J., dissenting). He also distinguished *Beardsley* because the parties to the conversation in that case "knew that the defendant had the tape recorder" and therefore "gave their *implied consent* to the recording of their conversation." *Id.* at 960. The defendant in *Herrington*, by contrast, recorded a conversation surreptitiously.

In 1994 the Illinois legislature amended the eavesdropping statute so that it applies to "any oral communication between 2 or more persons regardless of whether one or more of the parties intended their communication to be of a private nature under circumstances justifying that expectation." Ill. Pub. Act 88-677 (1994) (codified at 720 ILL. COMP. STAT. 5/14-1(d)). This amendment effectively overrode the *Beardsley* and *Herrington* decisions. As later interpreted by the Illinois Supreme Court, under the amended statute a party's consent may be "inferred from the surrounding circumstances indicating that the party knowingly agreed to the surveillance." *People v. Ceja*, 789 N.E.2d 1228, 1241 (Ill. 2003). However, express disapproval defeats any inference of consent. *Plock v. Bd. of Educ. of Freeport Sch. Dist. No. 145*, 920 N.E.2d 1087, 1095 (Ill. App. Ct. 2009).

The eavesdropping statute exempts recordings made by law-enforcement officers for law-enforcement purposes; officers have substantial discretion to record a wide variety of police-civilian encounters without the subject's consent. 720 ILL. COMP. STAT. 5/14-3(h). These include any "enforcement stop," a broadly defined term that includes "traffic stops," "motorist assists," "pedestrian stops," and "requests for identification." *Id*. Surreptitious law-enforcement intercepts for investigative purposes are governed by different subsections of the statute. *See id*. 5/14-3(g), (g-5), (g-6). The eavesdropping statute also contains an exemption for the media, at least in some circumstances; it exempts any recording made for "broadcast by radio, television, or otherwise" for live or "later broadcasts of any function where the public is in attendance and the conversations are overheard incidental to the main purpose for which such broadcasts are then being made." *Id*. 5/14-3(c).

## B. The ACLU's First Amendment Challenge

The ACLU filed this suit against Alvarez in her official capacity seeking declaratory and injunctive relief under 42 U.S.C. § 1983 barring her from enforcing the eavesdropping statute against audio recording that the organization plans to carry out in connection with its "police accountability program." More specifically, the ACLU intends to implement a "program of promoting police accountability by openly audio recording police officers without their consent when: (1) the officers are performing their public duties; (2) the officers are in

public places; (3) the officers are speaking at a volume audible to the unassisted human ear; and (4) the manner of recording is otherwise lawful." The program will include, among other things, audiovisual recording of policing at "expressive activity" events—protests and demonstrations—in public fora in and around the Chicago area. The organization also plans to make audiovisual recordings of policing at "expressive activities" carried out by its members. The ACLU intends to publish these recordings online and through other forms of electronic media.

The ACLU alleged that its planned audiovisual recording is protected under the First Amendment's speech, press, and petition clauses, but because of a credible fear of prosecution, it has not followed through on its program. The complaint asked for a declaratory judgment holding the eavesdropping statute unconstitutional as applied to the ACLU's planned recording and for a corresponding injunction barring the Cook County State's Attorney from enforcing the statute against the ACLU or its agents who carry out the recording. The ACLU also moved for a preliminary injunction.

The State's Attorney moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the ACLU lacks standing and failed to state a claim of a First Amendment violation. The district court granted the motion on jurisdictional grounds, holding that the complaint did not adequately allege a credible fear of prosecution and that the ACLU therefore lacked standing to sue. The dismissal was

without prejudice, however, so the ACLU moved to amend the judgment under Rule 59(e) to allow an amended complaint under Rules 15(a)(2) and 21. The proposed amended complaint addressed the standing defect the court had identified, adding two individual plaintiffs—Colleen Connell, the ACLU's Executive Director, and Allison Carter, the ACLU's Senior Field Manager—and more detail about the threat of prosecution. The ACLU renewed its motion for a preliminary injunction.

The State's Attorney opposed this second round of motions, and again the district court agreed. The judge held that although the ACLU had "cured the limited standing deficiencies" and now "sufficiently alleg[ed] a threat of prosecution," the proposed amended complaint contained a different standing defect. Relying on *Potts v. City of Lafayette*, 121 F.3d 1106, 1111 (7th Cir. 1997), the judge held that "[t]he ACLU has not alleged a cognizable First Amendment injury" because the First Amendment does not protect "a right to audio record." The judge also held that the ACLU had no First Amendment injury because the police officers and civilians who would be recorded were not "willing speakers." The judge viewed the ACLU's claim as "an unprecedented expansion of the First Amendment" and held that granting leave to amend would be futile because "[t]he ACLU has not met its burden of showing standing to assert a First Amendment right or injury." The judge denied the motion to amend and thus declined to address the request for a preliminary injunction. This appeal followed.

## II. Discussion

### A. Rule 59(e), Rule 15(a), and Preliminary-Injunction Standards

This case comes to us from an order denying a Rule 59(e) motion to alter or amend a judgment to allow the filing of an amended complaint under Rule 15(a)(2). We review this ruling for an abuse of discretion. *Sigsworth v. City of Aurora, Ill.,* 487 F.3d 506, 511 (7th Cir. 2007). But "[i]f the district court reached its conclusion because of its interpretation of relevant law, . . . then we review that question of law *de novo* because a district court's application of an erroneous view of the law is by definition an abuse of discretion." *Sosebee v. Astrue,* 494 F.3d 583, 586 (7th Cir. 2007).

The district court's decision turned on mistaken understandings about the relevant First Amendment doctrine. As we will explain, the ACLU and its employees have standing; they face a credible threat of prosecution under the eavesdropping statute, and their amended complaint plainly alleges a First Amendment injury. Denying leave to amend also had the effect of denying the ACLU's request for preliminary injunctive relief. The ACLU asks that we address that matter here.

"To win a preliminary injunction, a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Ezell v. City of Chicago,* 651 F.3d 684, 694 (7th Cir. 2011). If the moving party makes this threshold showing, the court "weighs the factors against one another, assessing

whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id.*

Ordinarily we would remand to allow the district court to weigh the preliminary-injunction factors in the first instance. However, in First Amendment cases, "the likelihood of success on the merits will often be the determinative factor." *Joelner v. Village of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004). This is because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion), and the "quantification of injury is difficult and damages are therefore not an adequate remedy," *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982). Moreover, if the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional. *Joelner*, 378 F.3d at 620. Stated differently, "injunctions protecting First Amendment freedoms are always in the public interest."[1]

---

[1] The State's Attorney argues that a preliminary injunction is inappropriate here because it would grant the ACLU affirmative relief rather than preserving the status quo. The Supreme Court has long since foreclosed this argument. *See Ashcroft v. ACLU*, 542 U.S. 656, 670-71 (2004) (finding a preenforcement

(continued...)

*Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

The parties have fully briefed the likelihood of success on the merits, which raises only a legal question. In this situation, it makes sense for us to address whether preliminary injunctive relief is warranted. *See Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 151 (7th Cir. 2011) (on appeal from an abstention order, deciding the plaintiff's entitlement to an injunction because it raised a pure legal question under the First Amendment).

We are confronted, then, with a series of legal questions: (1) has the ACLU established standing to sue; (2) does the amended complaint state a claim for a First Amendment violation; and (3) is that claim likely to succeed? The district court stopped after the first inquiry, holding that the ACLU does not have standing to sue because it has no cognizable First Amendment injury. The State's Attorney urges us to affirm this standing determination, though on a different rationale. In the alternative, she maintains that the proposed

---

[1] (...continued)

preliminary injunction appropriate to protect First Amendment rights because "speakers may self-censor rather than risk the perils of trial"); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("[P]rior to final judgment there is no established declaratory remedy comparable to a preliminary injunction; unless preliminary relief is available upon a proper showing, plaintiffs in some situations may suffer unnecessary and substantial irreparable harm.").

amended complaint does not state a claim for an actionable First Amendment violation. Standing comes before the merits, of course, *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 750 (7th Cir. 2011), but as we'll see, in this case there is some overlap, *see Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009).

## B. Standing

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing to sue in federal court,

> a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citing *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). Our review is de novo. *Pollack v. U.S. Dep't of Justice*, 577 F.3d 736, 739 (7th Cir. 2009).

It is well established that "preenforcement challenges . . . are within Article III." *Brandt v. Village of Winnetka, Ill.*, 612 F.3d 647, 649 (7th Cir. 2010). To satisfy the injury-in-fact requirement in a preenforcement action, the plaintiff must show "an intention to engage in a course

of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Stated differently, "[a] person need not risk arrest before bringing a pre-enforcement challenge under the First Amendment . . . ." *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010) (citing *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2717 (2010)); *see also Ezell*, 651 F.3d at 695. The "existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper [under Article III], because a probability of future injury counts as 'injury' for the purpose of standing." *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010); *see also Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) (A preenforcement plaintiff "need not show that the authorities have threatened to prosecute him" because "the threat is latent in the existence of the statute.").

The district court dismissed the first version of the ACLU's complaint because it did not sufficiently allege a credible threat of prosecution under the eavesdropping statute. The proposed amended complaint added two individual plaintiffs—ACLU employees Connell and Carter—and more details about the threat of prosecution, including information about recent prosecutions under the eavesdropping statute on like facts. That was enough to satisfy the district court on this point; based on the new allegations, the judge found that "[t]he threat of prosecution is credible and imminent." At this point, however, the judge perceived a different standing defect—one related to the merits of the claim.

Relying on our decision in *Potts*, the judge held that the First Amendment does not protect a "right to audio record" and therefore the ACLU had not alleged a constitutional injury. This was a misreading of *Potts.*

The issue in *Potts* was whether a police officer may refuse entry to an onlooker at a Ku Klux Klan rally because he wanted to bring a video camera onto the site. 121 F.3d at 1109-12. Past Klan rallies had inspired violence, so the police in Lafayette, Indiana, where the rally was to be held, established a rule banning any object that could be used as a weapon or projectile. John Potts arrived with a small video recorder and was denied entry based on the broad "no weapons" rule. He defied a police officer's order and entered anyway, and was promptly arrested.

Potts then sued the City of Lafayette and two officers alleging First and Fourth Amendment violations. We affirmed the summary judgment in favor of the defendants. *Id.* at 1114. Addressing the First Amendment claim, we said that "there is nothing in the Constitution which guarantees the right to record a public event." *Id.* at 1111 (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 610 (1978) (explaining that the Sixth Amendment does not require broadcasting trials to the public); *United States v. Kerley*, 753 F.2d 617, 620-22 (7th Cir. 1985) (recognizing that the exclusion of cameras from federal courtrooms is constitutional)). The district court seized on this single sentence from *Potts* and read it for much more than it's worth.

Immediately after this sentence is the following clarifying explanation: "The right to gather information

may be limited under certain circumstances. . . . The proper constitutional measure of the . . . 'weapons' ban is whether the restriction constitutes a valid time, place, or manner regulation." *Id.* In other words, as applied to Potts, Lafayette's ban *did* implicate free-speech interests under the First Amendment, but it was subject to review under the "time, place, or manner" standard applicable to content-neutral regulations. Our opinion in *Potts* continues on for several more pages, carefully applying that standard and upholding the weapons ban. *Id.* at 1111-12. If *Potts* stood for a categorical proposition that audiovisual recording is wholly unprotected, as the district court seemed to think, none of this analysis would have been necessary.

The court's second reason for rejecting the amended complaint was also off the mark. The judge held that without a "willing speaker," the ACLU had no First Amendment injury. In other words, because the ACLU does not plan to obtain consent from the officers and others whose communications will be recorded, there will be no "willing speakers" and the ACLU has no First Amendment right to receive and record their speech. By conceptualizing the case in this way, the judge seems to have assumed that, at most, only derivative speech rights are at stake.

That's an incorrect assumption. The district court's reliance on the "willing speaker" principle gets the doctrine right but its application wrong. It is well established that "[w]hen one person has a right to speak, others hold a 'reciprocal right to receive' the speech." *Ind. Right*

*to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976)). It's also true that this derivative "right to receive" or "right to listen" principle "presupposes a willing speaker." *Va. State Bd. of Pharmacy*, 425 U.S. at 756; *see also Shepard*, 507 F.3d at 549 ("a precondition of the right to receive . . . is the existence of a willing speaker" (internal quotation marks omitted)); *Bond*, 585 F.3d at 1077. But this is not a third-party "right to receive" case. The ACLU does not claim to be an intended recipient of police (or police-civilian) communications or to have a reciprocal right to receive the officers' speech as a corollary of the officers' right to speak.

Any bystander within earshot can hear what police officers say in public places; "receipt" occurs when the speech is uttered in public and at a volume that others can hear. In other words, the officers' speech is "received" at the moment it is heard; the eavesdropping statute obviously does not prohibit this. The ACLU's challenge to the statute implicates a different set of First Amendment principles. The "right to receive" strand of First Amendment doctrine—with its "willing speaker" precondition—has no bearing on the ACLU's standing.

The State's Attorney does not argue otherwise. Instead, she returns to the original standing problem that the district court identified. Alvarez maintains, as she did in the district court, that the ACLU has not alleged a credible threat of prosecution. We disagree. The eavesdropping statute plainly prohibits the ACLU's proposed

audio recording; Alvarez acknowledges as much. The recording will be directed at police officers, obviously increasing the likelihood of arrest and prosecution. The statute has not fallen into disuse. To the contrary, the ACLU has identified many recent prosecutions against individuals who recorded encounters with on-duty police officers; three of these were filed by Alvarez's office.[2] Finally, Alvarez has not foresworn the possibility of prosecuting the ACLU or its employees and agents if they audio record police officers without consent. *See Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 687 (7th Cir. 1998)

---

[2] The Cook County prosecutions are *People v. Drew*, No. 10-cr-46 (Cook Cnty., Ill., Cir. Ct.), *People v. Moore,* No. 10-cr-15709 (Cook Cnty., Ill., Cir. Ct.), and *People v. Tate*, No. 11-cr-9515 (Cook Cnty., Ill., Cir. Ct.). We note that the presiding judge in *People v. Drew* recently held that the eavesdropping statute violates substantive due process and dismissed the case. *People v. Drew*, No. 10-cr-46 (Cook Cnty., Ill., Cir. Ct. Mar. 7, 2012). The ACLU identified the following additional prosecutions under the eavesdropping statute for civilian audio recording of law-enforcement officers: *People v. Thompson*, No. 04-cf-1609 (6th Cir., Champaign Cnty., Ill.); *People v. Wight*, No. 05-cf-2454 (17th Cir., Winnebago Cnty., Ill.); *People v. Babarskas*, No. 06-cf-537 (12th Cir., Will Cnty., Ill.); *People v. Allison*, No. 09-cf-50 (2d Cir., Crawford Cnty., Ill.); *People v. Parteet*, No. 10-cf-49 (16th Cir., DeKalb Cnty., Ill.); *People v. Biddle*, No. 10-cf-421 (16th Cir., Kane Cnty., Ill.); *People v. Fitzpatrick,* No. 10-cf-397 (5th Cir., Vermillion Cnty., Ill.); *People v. Lee*, No. 08-cf-1791 (12th Cir., Will Cnty., Ill.); and *People v. Gordon,* No. 10-cf-341 (11th Cir., Livingston Cnty., Ill.).

("The Supreme Court has instructed us that a threat of prosecution is credible when a plaintiff's intended conduct runs afoul of a criminal statute and the Government fails to indicate affirmatively that it will *not* enforce the statute." (citing *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988))). These allegations are easily sufficient to establish a credible threat of prosecution.

Alvarez's arguments to the contrary are unavailing. She insists that the ACLU's program is "advocacy under the guise of First Amendment infringement" without any possibility of a "personal and concrete injury." We confess we do not understand the point. The ACLU's status as an advocacy organization hardly defeats its standing. The organization intends to use its employees and agents to audio record on-duty police officers in public places. The ACLU claims a First Amendment right to undertake this recording, but the eavesdropping statute prohibits it from doing so. The ACLU itself, and certainly its employees and agents (Connell, Carter, and others), will face prosecution for violating the statute. *See* 720 ILL. COMP. STAT. 5/14-1(b), (c) (defining "eavesdropper" and the liability of an eavesdropper's "principal"); *see more generally id.* 5/5-4(a)(2) (providing for corporate liability if the "offense is authorized, requested, commanded, or performed, by the board of directors or by a high managerial agent who is acting within the scope of his or her employment in behalf of the corporation"). Nothing more is needed for preenforcement standing.

The State's Attorney maintains that the injury alleged here is "merely conjectural or hypothetical" because the threat of prosecution will only occur "at some indefinite future time" and "the identities of the parties to the conversations that [the] ACLU and its members want to audio record is wholly unknown." This argument is a nonstarter. It is well established that in preenforcement suits "[i]njury need not be certain." *Brandt*, 612 F.3d at 649. This is not a case in which the threat of prosecution hinges on a highly attenuated claim of speculative future events or unknowable details about the manner in which the statutory violation will be committed or enforced. *Cf., e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983) (future injury depended on plaintiff violating an unchallenged law and provoking constitutional violations based on the manner of police enforcement); *Schirmer*, 621 F.3d at 587 (challenged law could not "fairly be read to prohibit" plaintiffs' actions).

It's true that the ACLU does not know precisely when it or its employees would face prosecution or which officers would be involved. Preenforcement suits always involve a degree of uncertainty about future events. *See Brandt*, 612 F.3d at 649 ("Any pre-enforcement suit entails some element of chance . . . ."). So long as that uncertainty does not undermine the credible threat of prosecution or the ability of the court to evaluate the merits of the plaintiff's claim in a preenforcement posture, there is no reason to doubt standing. Here, absent officer consent, the eavesdropping statute flatly prohibits the ACLU's planned recording, exposing the organization and its employees to arrest and criminal

punishment. The State's Attorney has recently pros-
ecuted similar violations and intends to continue doing
so. That's enough to establish a credible threat of pros-
ecution.[3]

Finally, the State's Attorney argues that principles
of *Younger* abstention affect the standing inquiry, or
alternatively, that *Younger* abstention applies. *See Younger*

---

[3] Although the State's Attorney does not raise it, a possible
ground for doubting standing might be that *openly* made
recordings could fall within the implied-consent doctrine. *See
People v. Ceja*, 789 N.E.2d 1228, 1241 (Ill. 2003) (Consent may be
"inferred from the surrounding circumstances," including
facts showing that "a party knows of . . . encroachments on
the routine expectation that conversations are private.").
Implied consent is a factual issue for trial in a prosecution
under the eavesdropping statute. That the ACLU and its
employees may face prosecution is injury enough for
preenforcement standing, even though they might be able to
defend based on implied consent. Moreover, the implied-
consent doctrine, and more particularly its potential applica-
tion in particular cases, is sufficiently ambiguous for the
ACLU to have a credible fear of criminal liability. *See, e.g.*,
*Williams v. Poulos*, 11 F.3d 271, 281 (1st Cir. 1993) ("Implied
consent is not . . . constructive consent. Rather, implied consent
is consent in fact which is inferred from surrounding circum-
stances indicating that the party *knowingly agreed* to the sur-
veillance." (citations and internal quotation marks omitted));
*see also Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010)
("[W]hen an ambiguous statute arguably prohibits certain
protected speech, a reasonable fear of prosecution can
provide standing for a First Amendment challenge.").

*v. Harris*, 401 U.S. 37 (1971). "*Younger* abstention is appropriate only when there is an action in state court against the federal plaintiff and the state is seeking to enforce the contested law in that proceeding." *Forty One News, Inc. v. County of Lake*, 491 F.3d 662, 665 (7th Cir. 2007). We have suggested in dicta that if a state prosecution "really *were* imminent, then a federal court might well abstain on comity grounds." *520 S. Mich. Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 963 (7th Cir. 2006). The State's Attorney maintains that because standing requires an imminent injury, *Younger* abstention must apply. By this logic, *Younger* precludes all federal preenforcement challenges to state laws. That's obviously not right. The State's Attorney's argument misunderstands the basis of preenforcement standing, which "depends on the probability of harm, not its temporal proximity." *Id.* at 962. *Younger* abstention does not apply and does not affect the standing inquiry. *See Hoover v. Wagner*, 47 F.3d 845, 848 (7th Cir. 1995).

## C.  The First Amendment Claim

On the merits the State's Attorney has staked out an extreme position. She contends that openly recording what police officers say while performing their duties in traditional public fora—streets, sidewalks, plazas, and parks—is *wholly unprotected* by the First Amendment. This is an extraordinary argument, and it rests in large part on the same misreading of *Potts* and misapplication of the "willing speaker" principle that infected the district court's standing determination. We have already

corrected these misunderstandings and need not re-
peat that analysis here.

For its part the ACLU contends that the eavesdropping
statute, as applied to the facts alleged here, is subject
to strict scrutiny. Whether strict scrutiny or some more
forgiving standard of judicial review applies depends
on what kind of First Amendment interest is at stake
and how the eavesdropping statute affects that interest.

1. *The Eavesdropping Statute Burdens Individual Speech and Press Rights*

Unlike the federal wiretapping statute and the eaves-
dropping laws of most other states,[4] the gravamen of
the Illinois eavesdropping offense is not the secret inter-
ception or surreptitious recording of a private commu-
nication. Instead, the statute sweeps much more broadly,
banning *all* audio recording of *any* oral communication
absent consent of the parties regardless of whether the
communication is or was intended to be private. The

---

[4] As best we can tell, the Illinois statute is the broadest of its
kind; no other wiretapping or eavesdropping statute prohibits
the open recording of police officers lacking any expectation
of privacy. *See* 18 U.S.C. § 2510(2); Jesse Harlan Alderman,
*Police Privacy in the iPhone Era?*, 9 FIRST AMEND. L. REV. 487, 533-
45 (2011) (collecting state statutes); *cf.* OR. REV. STAT.
§ 165.540(1)(c), (6)(a) (exempting "unconcealed" recordings
at public events but otherwise requiring that "all participants
in the conversation are specifically informed that their con-
versation is being obtained").

expansive reach of this statute is hard to reconcile with basic speech and press freedoms. For reasons we will explain, the First Amendment limits the extent to which Illinois may restrict audio and audiovisual recording of utterances that occur in public.[5]

Audio and audiovisual recording are media of expression commonly used for the preservation and dissemination of information and ideas and thus are "included within the free speech and free press guaranty of the First and Fourteenth Amendments." *Burstyn v. Wilson*, 343 U.S. 495, 502 (1952) (holding that movies are a protected form of speech). Laws that restrict the use of expressive media have obvious effects on speech and press rights; the Supreme Court has "voiced particular concern with laws that foreclose an entire medium of expression." *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994) (collecting cases); *see also Reno v. ACLU*, 521 U.S. 844, 869-70 (1997) (recognizing that the internet is a "dynamic, multifaceted category of communication" and that there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium").

The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's

---

[5] The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press," U.S. CONST. amend. I, and applies to the States through Section 1 of the Fourteenth Amendment, U.S. CONST. amend. XIV, § 1. *See Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 707 (1931).

guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording. The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of *making* the recording is wholly unprotected, as the State's Attorney insists. By way of a simple analogy, banning photography or note-taking at a public event would raise serious First Amendment concerns; a law of that sort would obviously affect the right to publish the resulting photograph or disseminate a report derived from the notes. The same is true of a ban on audio and audiovisual recording.

This is a straightforward application of the principle that "[l]aws enacted to control or suppress speech may operate at different points in the speech process." *Citizens United v. FEC*, 130 S. Ct. 876, 896 (2010). The Illinois eavesdropping statute regulates the use of a medium of expression; the Supreme Court has recognized that "regulation of a medium [of expression] inevitably affects communication itself." *City of Ladue*, 512 U.S. at 48 (invalidating an ordinance banning residential signs). Put differently, the eavesdropping statute operates at the front end of the speech process by restricting the use of a common, indeed ubiquitous, instrument of communication. Restricting the use of an audio or audiovisual recording device suppresses speech just as effectively as restricting the dissemination of the resulting recording.

As our colleagues in the Ninth Circuit have observed, there is no fixed First Amendment line between the act of creating speech and the speech itself:

> Although writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect the end product from the act of creation. Thus, we have not drawn a hard line between the essays John Peter Zenger published and the act of setting the type. *Cf. Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582 (1983) (holding that a tax on ink and paper "burdens rights protected by the First Amendment"). The process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas, or that we could value Beethoven without the benefit of strings and woodwinds. In other words, we have never seriously questioned that the processes of writing words down on paper, painting a picture, and playing an instrument are purely expressive activities entitled to full First Amendment protection.

*Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-62 (9th Cir. 2010).

This observation holds true when the expressive medium is mechanical rather than manual. For instance, "[i]f the state were to prohibit the use of projectors without a license, First Amendment coverage would undoubtedly be triggered. This is not because projectors constitute speech acts, but because they are integral to the forms of interaction that comprise the genre of the cinema." Robert Post, *Encryption Source Code and the First Amendment*, 15 BERKELEY TECH. L.J. 713, 717 (2000).

The Supreme Court's campaign-finance cases illustrate how laws of this sort trigger First Amendment scrutiny. The Court held long ago that campaign-finance regulations implicate core First Amendment interests because raising and spending money *facilitates* the resulting political speech. *See Buckley v. Valeo*, 424 U.S. 1, 19 (1976) (per curiam) (restricting money spent on political communications "necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached"); *see also Citizens United*, 130 S. Ct. at 898 (invalidating the federal ban on corporate and union spending for political speech because the government may not "repress speech by silencing certain voices at any of the various points in the speech process"); *McConnell v. FEC*, 540 U.S. 93, 252 (2003) (Scalia, J., concurring in part and dissenting in part) ("The right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise."); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 400 (2000) (Breyer, J., concurring) ("[A] decision to contribute money to a campaign is a matter of First Amendment concern—not because money *is* speech (it is not); but because it *enables* speech.").

So too with laws that restrict audio recording. Audio and audiovisual recording are communication technologies, and as such, they enable speech. Criminalizing all nonconsensual audio recording necessarily limits the information that might later be published or broadcast—whether to the general public or to a single family member or friend—and thus burdens First Amend-

ment rights. If, as the State's Attorney would have it, the eavesdropping statute does not implicate the First Amendment *at all*, the State could effectively control or suppress speech by the simple expedient of restricting an early step in the speech process rather than the end result. We have no trouble rejecting that premise. Audio recording is entitled to First Amendment protection.[6]

And here, the First Amendment interests are quite strong. On the factual premises of this case, the eavesdropping statute prohibits nonconsensual audio recording of public officials performing their official duties in public. "'[T]here is practically universal agreement that a major purpose of' the First Amendment 'was to protect the free discussion of governmental affairs' . . . ." *Ariz. Free Enter. Club's Freedom Fund PAC v. Bennett*, 131 S. Ct. 2806, 2828 (2011) (quoting *Buckley*, 424 U.S. at 14). This agreement "'reflects our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-

---

[6] For more on how the First Amendment protects the use of communications technology, see Eugene Volokh, *Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today*, 160 U. Pa. L. Rev. 459 (2012); Seth F. Kreimer, *Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record*, 159 U. Pa. L. Rev. 335 (2011); Diane Leenheer Zimmerman, *I Spy: The Newsgatherer Under Cover*, 33 U. Rich. L. Rev. 1185 (2000); Rodney A. Smolla, *Privacy and the First Amendment Right to Gather News*, 67 Geo. Wash. L. Rev. 1097 (1999).

open.'" *Id.* at 2828-29 (quoting *Buckley*, 424 U.S. at 14, quoting *New York Times v. Sullivan*, 373 U.S. 254, 270 (1964)). Moreover, "the First Amendment goes beyond protection of the press and self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1977). The freedom of speech and press "'embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment.'" *Id.* at 767 (quoting *Thornhill v. Alabama*, 310 U.S. 88, 101-02 (1940)).

In this regard, the ACLU's challenge to the eavesdropping statute also draws on the principle that the First Amendment provides at least some degree of protection for gathering news and information, particularly news and information about the affairs of government. *See Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). In *Branzburg* a news reporter claimed a First Amendment privilege to refuse to testify before a grand jury about his confidential sources. *Id.* at 667. The reporter argued that without an implied testimonial privilege, the right "of the press to collect and disseminate news" would be undermined. *Id.* at 698.

The Court rejected this claim, but before doing so it made the following general observation:

> The heart of the claim is that the burden on news gathering resulting from compelling reporters to disclose confidential information outweighs any public interest in obtaining the information [by grand-jury subpoena].

We do not question the significance of free speech, press, or assembly to the country's welfare. Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated.

*Id.* at 681. The Court declined to fashion a special journalists' privilege for essentially two reasons. First, the Court relied on the general principle that "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability." *Id.* at 682. By this the Court meant that "otherwise valid laws serving substantial public interests may be enforced *against the press as against others,* despite the possible burden that may be imposed." *Id.* at 682-83 (emphasis added). Stated differently, the institutional press "'has no special immunity from the application of general laws.'" *Id.* at 683 (quoting *Associated Press v. NLRB,* 301 U.S. 103, 132-33 (1937)). Second, the Court held that the public interest in detecting, punishing, and deterring crime was much stronger than the marginal increase in the flow of news about crime that a journalist's testimonial privilege might provide. *See id.* at 700-01.

We will return to the point about generally applicable laws in a moment. For now, it is enough to note that the Court did not use that principle to reject the reporter's claim out of hand. Instead, the Court evaluated the State's demand for the reporter's testimony against the First Amendment interests at stake and held that the

public's interest in obtaining "'every man's evidence'" justified the incidental burden on First Amendment rights. *Id.* at 687 (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)). The Court specifically reserved the question whether in a particular case, a subpoena for a reporter's testimony might be a pretext for "[o]fficial harassment of the press," a circumstance that "would pose wholly different issues for resolution under the First Amendment." *Id.* at 707.

The Supreme Court has not elaborated much on its abstract observation in *Branzburg* that "news gathering is not without its First Amendment protections."[7] *Id.* The

---

[7] One exception appears to be the Court's caselaw recognizing a limited constitutional "right of access" to certain governmental proceedings. Based in part on the principle that the First Amendment protects a right to gather information about the government, the Court has recognized a qualified right of the press and public to attend certain governmental proceedings, at least where the proceeding "historically has been open to the press and general public," and public access "plays a particularly significant role" in the functioning of the proceeding in question and "the government as a whole." *Globe Newspaper Co. v. Super. Ct. for the Cnty. of Norfolk*, 457 U.S. 596, 605-06 (1982) (holding that a statute mandating closure of criminal trial during testimony of minor sexual-assault victim fails strict scrutiny); *see also Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-9 (1986) (recognizing a qualified First Amendment right of the press and public to attend preliminary hearings); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576-77 (1980) (plurality opinion) (holding that

(continued...)

*Branzburg* opinion itself suggests some caution in relying too heavily on the Court's discussion of a First Amendment right to gather news and information. *See id.* at 703-04 (noting that an expansive judicially administered right to gather information would "present practical and conceptual difficulties of a high order" and "embark the judiciary on a long and difficult journey" with an "uncertain destination"). Still, the Court's observation that speech and press freedom includes, by implication, "some protection" for gathering information about the affairs of government is consistent with the historical understanding of the First Amendment.

To the founding generation, the liberties of speech and press were intimately connected with popular sovereignty and the right of the people to see, examine, and

---

[7] (...continued)

the First Amendment protects the right of the press and public to attend criminal trials); *In re Cont'l Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984) (recognizing a right to attend civil trials); *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 652 F.3d 247, 260-61 (2d Cir. 2011) (recognizing a right to attend transit-authority meetings); *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 181 (3d Cir. 1999) (recognizing a right to attend planning-commission meetings).

This is not, strictly speaking, a claim about the qualified First Amendment right of access to governmental proceedings. Access is assumed here; the ACLU claims a right to audio record events and communications that take place in traditional public fora like streets, sidewalks, plazas, parks, and other open public spaces.

be informed of their government. For example, in one of the most famous eighteenth-century essays on the freedom of speech,[8] Whig commentator Thomas Gordon explained:

> "That Men ought to speak well of *their Governours* is true, while *their Governours* deserve to be well spoken of; but to do publick Mischief, without hearing of it, is only the Prerogative and Felicity of Tyranny: A free People will be shewing that they are *so*, by their Freedom of Speech.
>
> The Administration of Government, is nothing else but the Attendance of the *Trustees of the People* upon the Interest and Affairs of the People: And as it is the Part and Business of the People, for whose Sake alone all publick Matters are, or ought to be transacted, to see whether they be well or ill transacted; so it is the Interest, and ought to be the Ambition, of all honest Magistrates, to have their Deeds openly examined, and publickly scann'd."

---

[8] *See, e.g.*, BERNARD BAILYN, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION 36 (1967) (observing that *Cato's Letters*, which included Gordon's essay on the freedom of speech, were "republished entire or in part again and again . . . and referred to repeatedly in the pamphlet literature, . . . rank[ing] with the treatises of Locke as the most authoritative statement of the nature of political liberty and above Locke as an exposition of the social sources of the threats it faced"); Donald S. Lutz, *The Relative Influence of European Writers on Late Eighteenth-Century American Political Thought*, 78 AM. POL. SCI. REV. 189, 194 (1984).

*Silence Dogood No. 8*, THE NEW-ENGLAND COURANT (Boston), July 9, 1722, *reprinted in* 1 THE PAPERS OF BENJAMIN FRANKLIN 28 (Leonard W. Labaree et al. eds., 1959) (quoting *Cato's Letter No. 15*). Other colonial writers "stressed the necessity and right of the people to be informed of their governors' conduct so as to shape their own judgments on 'Publick Matters' and be qualified to choose their representatives." LEONARD W. LEVY, EMERGENCE OF A FREE PRESS 134 (2004). The Virginia General Assembly objected to the infamous Sedition Act of 1798 in part "because it is levelled against that *right of freely examining public characters and measures*, and of free communication among the people thereon." Virginia Resolutions of 1798, *reprinted in* 17 THE PAPERS OF JAMES MADISON 189-90 (David B. Mattern et al. eds., 1991) (emphasis added). In a subsequent report, James Madison explained that the Sedition Act had "repressed that *information* and communication among the people, which is indispensable to the just exercise of their electoral rights." Virginia Report of 1800, *reprinted in* 17 THE PAPERS OF JAMES MADISON 343 (emphasis added).

This understanding prevailed at the time the Fourteenth Amendment was ratified. In his famous 1868 treatise on constitutional law, Thomas Cooley explained that a foremost purpose of the Constitution's guarantee of speech and press liberty is

> to secure the[] right to a free discussion of public events and public measures, and to *enable every citizen at any time to bring the government and any person in authority to the bar of public opinion by any*

> *just criticism upon their conduct in the exercise of the authority which the people have conferred upon them.* To guard against repressive measures by the several departments of government, by means of which persons in power might secure themselves and their favorites from just scrutiny and condemnation, was the general purpose . . . . The evils to be guarded against were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens.

THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS 421-22 (1868) (emphasis added); *see also* Eugene Volokh, *Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today*, 160 U. PA. L. REV. 459 (2012) (collecting sources from the framing to the modern era); *see generally* AKHIL REED AMAR, THE BILL OF RIGHTS 20-26, 231-45 (1996) (explaining the structural role of speech and press rights based on founding-era and Reconstruction history).

In short, the eavesdropping statute restricts a medium of expression—the use of a common instrument of communication—and thus an integral step in the speech process. As applied here, it interferes with the gathering and dissemination of information about government officials performing their duties in public. Any way you look at it, the eavesdropping statute burdens speech and press rights and is subject to heightened First Amendment scrutiny.

The First Circuit agrees. In *Glik v. Cunniffe*, 655 F.3d 78, 79-81 (1st Cir. 2011), the court considered a claim of qualified immunity in a damages suit brought by a bystander who was arrested for using his cell phone to record police officers making an arrest on the Boston Common. The bystander alleged that the officers violated his rights under the First Amendment; the First Circuit rejected the officers' defense of qualified immunity. *Id.* The court framed the issue this way: "[I]s there is a constitutionally protected right to videotape police carrying out their duties in public?" *Id.* at 82. The court held that "[b]asic First Amendment principles, along with case law from this and other circuits, answer that question unambiguously in the affirmative."[9] *Id.* The court went on to conclude that the right to record the police was clearly established, resting its conclusion primarily on the Supreme Court's observations about the right to gather and disseminate information about government: "Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'" *Id.* (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).[10]

---

[9] The claimant in *Glik* recorded the arrest because he thought the police were using excessive force. But the court's First Amendment ruling was not limited to "defensive" recording to preserve evidence of wrongdoing, as our dissenting colleague suggests. Dissent at 54.

[10] On the other hand, the Third Circuit resolved a similar
(continued...)

Before moving on, a few words about challenges to generally applicable laws. As we have noted, the Supreme Court's decision in *Branzburg* rested in part on the principle that a generally applicable law will not violate the First Amendment simply because its application has an incidental effect on speech or the press. 408

---

[10] (...continued)

qualified-immunity question differently in *Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010), which involved a First Amendment claim by a plaintiff who was arrested under the Pennsylvania wiretapping statute for recording a police officer during a traffic stop. Although the Third Circuit found some support for a First Amendment right to record police officers performing their duties in public in some situations, *id.* at 260-62, the court held that "there [i]s insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment," *id.* at 262.

The First Circuit's decision in *Glik* aligns with authority from the Eleventh Circuit and with the weight of district-court decisions. *See Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (summarily recognizing "a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct"); *see also* Seth F. Kreimer, *Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record*, 159 U. PA. L. REV. 335, 368 n.113 (2011) (collecting district-court cases).

This case does not, of course, raise a question of qualified immunity; we do not need to take sides in the circuit split in order to decide this case.

U.S. at 682; *see also Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991) ("[G]enerally applicable laws do not offend the First Amendment simply because their enforcement . . . has incidental effects on [the] ability to gather and report the news."); *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 707 (1986) ("[T]he First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books.").

It's important to note that the legal sanction at issue in *Branzburg*—enforcement of a grand-jury subpoena—was not aimed at the exercise of speech or press rights as such. Likewise *Cohen* involved a claim by two newspapers for a special First Amendment immunity from damages liability for breach of a promise to keep a source's identity confidential. As in *Branzburg,* the Court rejected the claim of special press immunity and upheld the damages award against the newspapers. The Court observed that the doctrine of promissory estoppel is generally applicable and the "enforcement of such general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations." *Cohen*, 501 U.S. at 670. *Branzburg* and *Cohen* thus stand for the unremarkable proposition that the press does not enjoy a special constitutional exemption from generally applicable laws.

Similarly, in *Arcara* the Court upheld a court order shutting down an adult bookstore pursuant to a state nuisance statute authorizing the closure of premises where prostitution is ongoing. The Court held that

"the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books." 478 U.S. at 707. The Court noted, however, that it would be a different case if "the 'nonspeech' which drew sanction was intimately related to expressive conduct protected under the First Amendment." *Id.* at 706 n.3. Instead, the "nonspeech" that was subject to general public-health regulation in *Arcara*—operating an establishment where prostitution is carried on—"bears absolutely no connection to any expressive activity," notwithstanding that the establishment is also a bookstore. *Id.* at 707 n.3.

On the other hand, in *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991), the Court applied First Amendment scrutiny to Indiana's public-indecency statute as applied to establishments that offer nude dancing. The Court observed that "nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so." *Id.* at 566. Applying the intermediate standard of review established in *United States v. O'Brien*, 391 U.S. 367, 376-77 (1968), the Court upheld Indiana's modest requirement that dancers wear a modicum of clothing ("pasties" and "G-strings") because that requirement served "a substantial government interest in protecting order and morality," *Barnes*, 501 U.S. at 569, and was "the bare minimum necessary to achieve the State's purpose," *id.* at 572.

These cases illustrate the point that "enforcement of a generally applicable law may or may not be subject to

heightened scrutiny under the First Amendment." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640 (1994); *see also Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 521-22 (4th Cir. 1999). When the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play. On the other hand, when "speech" and "nonspeech" elements are combined, and the "nonspeech" element (e.g., prostitution) triggers the legal sanction, the incidental effect on speech rights will not normally raise First Amendment concerns. *See* Eugene Volokh, *Speech as Conduct, Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 CORNELL L. REV. 1277, 1278-93 (2005).

The Illinois eavesdropping statute may or may not be a law of general applicability; as we have noted, it contains a number of exemptions. Either way, it should be clear by now that its effect on First Amendment interests is far from incidental. To the contrary, the statute specifically targets a communication technology; the use of an audio recorder—a medium of expression—triggers criminal liability. The law's legal sanction is directly leveled against the expressive element of an expressive activity. As such, the statute burdens First Amendment rights directly, not incidentally.

### 2.  *Content Based or Content Neutral?*

The ACLU contends that the eavesdropping statute is subject to strict scrutiny because it restricts speech based on its content and discriminates among speakers.

The First Amendment "does not countenance govern-ment control over the content of messages expressed by private individuals." *Turner*, 512 U.S. at 641. This is a "bedrock principle" of First Amendment law. *Snyder v. Phelps*, 131 S. Ct. 1207, 1219 (2011) (quotation marks omitted). "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quotation marks omitted). Laws that restrict speech based on its content are "presumptively invalid, and the Government bears the burden to rebut that presumption." *United States v. Stevens*, 130 S. Ct. 1577, 1584 (2010) (quotation marks omitted).

Accordingly, regulatory measures "that suppress, disadvantage, or impose differential burdens upon speech because of its content" are subject to strict scru-tiny. *Turner*, 512 U.S. at 642. "In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny . . . because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Id.* (citation omitted). Although the line between content-neutral and content-based laws is sometimes hard to draw, "the 'principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagree-ment with the message it conveys.'" *Id.* (alterations in original) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Stated differently, "laws that by their terms distinguish favored speech from disfavored

speech on the basis of the ideas or views expressed are content based." *Id.* at 643.

The eavesdropping statute is content neutral on its face. It does not target any particular message, idea, or subject matter. The ACLU argues that the eavesdropping statute should be treated as a content-based restriction because its enforcement requires an examination of the audio recording to determine whether a violation has occurred. This argument misunderstands the First Amendment requirement of content neutrality. A law is not considered "content based" simply because a court must "look at the content of an oral or written statement in order to determine whether a rule of law applies." *Hill v. Colorado*, 530 U.S. 703, 721 (2000).

The ACLU also argues that the eavesdropping statute discriminates among speakers by allowing "uniformed on-duty police at their discretion and without court approval to make virtually any audio recording of their conversations with civilians, while forbidding civilians from making virtually any audio recording of those same conversations." Here the ACLU relies on the well-established principle that

> the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice.

*Citizens United*, 130 S. Ct. at 899. But this kind of content-based discrimination arises when the government discriminates among *private* speakers, not when it facilitates its own speech. For example, a governmental agency that records its own meetings but bars members of the public from doing so has not preferred one class of private speakers over another, although other First Amendment concerns might arise. Here, the exemption for law-enforcement officers is constitutionally insignificant.[11]

The exemption for the media may be another matter, however. As we have noted, the eavesdropping statute exempts live broadcasts or recordings made for later broadcast "by radio, television, or otherwise" of "any function where the public is in attendance and the conversations are overheard incidental to the main purpose for which such broadcasts are then being made." 720 ILL. COMP. STAT. 5/14-3(c). This exemption appears to be aimed at media coverage of public events in which conversations are captured without consent as an incidental consequence of broadcasting the event itself, or recording it for later broadcast. This exemption for broadcasting may amount to discrimination among private speakers, though perhaps it's broad enough to cover recordings made by individuals as well as the

---

[11] The ACLU also suggests that the statute's enhanced penalty for recording a police officer, prosecutor, or judge amounts to content-based discrimination. This argument is off point. The ACLU is not seeking an injunction against the penalty enhancement.

institutional press. *See Turner*, 512 U.S. at 659 ("Regulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns."). We need not decide the effect of this exemption here. The ACLU does not mention it, probably because the recordings at issue in this case are not limited to those that are "incidental" to recording a public event.

In the end, we think it unlikely that strict scrutiny will apply. But there is no need to resolve the matter here. The ACLU's challenge is likely to succeed under any of the less rigorous standards of scrutiny that apply to restrictions on speech. At the very least, the State's Attorney will have to justify this application of the eavesdropping statute under some form of intermediate scrutiny.

### 3. *The Eavesdropping Statute Likely Fails Intermediate Scrutiny*

The Supreme Court uses several variations of intermediate scrutiny in its free-speech cases. When an intermediate standard of review applies in the campaign-finance context—for example, when the Court reviews limits on contributions to candidates—the challenged law must be "closely drawn to serve a sufficiently important interest . . . ." *Ariz. Free Enter. Club*, 131 S. Ct. at 2817 (internal quotation marks omitted); *see also Doe v. Reed*, 130 S. Ct. 2811, 2818 (2010).

In commercial-speech cases, the government must establish that the challenged statute "directly advances

a substantial governmental interest and that the measure is drawn to achieve that interest." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667-68 (2011). Stated differently, intermediate scrutiny in this context requires "a 'fit' between the legislature's ends and the means chosen to accomplish those ends, . . . a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (citations and internal quotation marks omitted).

Under the Court's speech-forum doctrine, a regulatory measure may be permissible as a "time, place, or manner" restriction if it is "'justified without reference to the content of the regulated speech, . . . narrowly tailored to serve a significant governmental interest, . . . and . . . leave[s] open ample alternative channels for communication of the information.'" *Ward*, 491 U.S. at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

Though stated in different terms, these intermediate-scrutiny standards share certain essential elements in common. All require (1) content neutrality (content-based regulations are presumptively invalid); (2) an important public-interest justification for the challenged regulation; and (3) a reasonably close fit between the law's means and its ends. This last requirement means that the burden on First Amendment rights must not be greater than necessary to further the important governmental interest at stake. *See Fox*, 492 U.S. at 480;

*Ward*, 491 U.S. at 799; *see also O'Brien*, 391 U.S. at 376-77 (stating an alternative formulation of intermediate scrutiny).

As we have explained, the eavesdropping statute probably satisfies the requirement of content neutrality. As applied here, however, it very likely fails the rest of the test. The State's Attorney defends the law as necessary to protect conversational privacy. This is easily an important governmental interest. *Bartnicki v. Vopper*, 532 U.S. 514, 532 (2001) ("Privacy of communication is an important interest . . . ."). Indeed, the protection of personal conversational privacy serves First Amendment interests because "fear of public disclosure of private conversations might well have a chilling effect on private speech." *Id.* at 533.

At common law, actionable invasion of privacy takes several forms: (1) an unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness; (3) unreasonable publicity given to another's private life; and (4) publicity that unreasonably places another in a false light before the public. RESTATEMENT (SECOND) OF TORTS § 652A; *Wolfe v. Schaefer*, 619 F.3d 782, 784 (7th Cir. 2010); *Desnick v. Am. Broad. Cos.*, 44 F.3d 1345, 1353 (7th Cir. 1995); *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1229 (7th Cir. 1993). In Fourth Amendment law, there is "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (plurality opinion); *see also* Orin S. Kerr, *Four Models of Fourth Amendment Protection*, 60 STAN. L. REV.

503 (2007) (discussing different understandings of privacy). But surreptitiously accessing the private communications of another by way of trespass or nontrespassory wiretapping or use of an electronic listening device clearly implicates recognized privacy expectations. *See United States v. Jones,* 132 S. Ct. 945, 945-52 (2012); *Bartnicki,* 532 U.S. at 526; *Katz v. United States*, 389 U.S. 347, 351-52 (1967).

Simply put, these privacy interests are not at issue here. The ACLU wants to openly audio record police officers performing their duties in public places and speaking at a volume audible to bystanders. Communications of this sort lack any "reasonable expectation of privacy" for purposes of the Fourth Amendment. *See Katz*, 389 U.S. at 351 ("What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."); *id.* at 361 (Harlan, J., concurring) ("[C]onversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable."). Dissemination of these communications would not be actionable in tort. *See* RESTATEMENT (SECOND) OF TORTS §§ 652B, 652D (explaining the elements of the different invasion-of-privacy torts).[12]

---

[12] Nothing we have said here endangers the tort law of privacy, as the dissent suggests. Dissent at 59-60. A tortious invasion of privacy occurs when a person "gives publicity to a matter concerning the private life of another . . . *if* the matter publicized is *of a kind* that (a) would be *highly offensive to a*

(continued...)

Of course, the First Amendment does not prevent the Illinois General Assembly from enacting greater protection for conversational privacy than the common-law tort remedy provides. Nor is the legislature limited to using the Fourth Amendment "reasonable expectation of privacy" doctrine as a benchmark. But by legislating this broadly—by making it a crime to audio record *any* conversation, even those that are *not* in fact private—the State has severed the link between the eavesdropping statute's means and its end. Rather than attempting to tailor the statutory prohibition to the important goal of protecting personal privacy, Illinois has banned nearly all audio recording without consent of the parties—including audio recording that implicates *no* privacy interests at all.

The ACLU's proposed audio recording will be otherwise lawful—that is, not disruptive of public order or safety, and carried out by people who have a legal right to be in a particular public location and to watch and listen to what is going on around them. The State's Attorney concedes that the ACLU's observers may lawfully watch and listen to the officers' public communications, take still photographs, make video recordings with microphones switched off, or take shorthand notes and transcribe the conversations or otherwise recon-

---

[12] (...continued)

*reasonable person*, and (b) is *not of legitimate concern to the public*." RESTATEMENT (SECOND) OF TORTS § 652D (emphasis added). The communications at issue here are not of this kind.

struct the dialogue later. The ACLU may post all of this information on the internet or forward it to news outlets, all without violating the Illinois eavesdropping statute. The State's Attorney has not identified a substantial governmental interest that is served by banning audio recording of these same conversations. We acknowledge the difference in accuracy and immediacy that an audio recording provides as compared to notes or even silent videos or transcripts. But in terms of the *privacy* interests at stake, the difference is not sufficient to justify criminalizing this particular method of preserving and publishing the public communications of these public officials.

The State's Attorney insists that the broad reach of the statute is necessary to "remove[] incentives for interception of private conversations and minimize[] the harm to persons whose conversations have been illegally intercepted." At the risk of repeating ourselves, this case has nothing to do with private conversations or surreptitious interceptions. We accept Judge Posner's point that "private talk in public places is common." Dissent at 64. But the communications in question here do not fall into this category; they are not conversations that carry privacy expectations even though uttered in public places. Moreover, the ACLU plans to record *openly,* thus giving the police and others notice that they are being recorded.[13]

---

[13] We are not suggesting that the First Amendment protects only *open* recording. The distinction between open and con-

(continued...)

The State's Attorney also argues that the statute endeavors to "[1.] encourage that civilians candidly speak with law enforcement, including those conversations conditioned on confidentiality; [2.] limit opportunities of the general public from gaining access to matters of national and local security; and [3.] reduce the likelihood of provoking persons during officers' mercurial encounters." These interests are not threatened here. Anyone who wishes to speak to police officers in confidence can do so; private police-civilian communications are outside the scope of this case. Police discussions about matters of national and local security do not take place in public where bystanders are within earshot; the State's Attorney has made no effort to connect this law-enforcement concern to the communications at issue here. It goes without saying that the police may take all reasonable steps to maintain safety and control, secure crime scenes and accident sites, and protect the integrity and confidentiality of investigations. While an officer surely cannot issue a "move on" order to a person *because* he is recording, the police may order bystanders to disperse for reasons related to public safety and order and other legitimate law-enforcement needs. *See, e.g.*, *Colten v. Kentucky*, 407 U.S. 104, 109 (1972) (rejecting a First Amendment right to congregate on

---

[13] (...continued)

cealed recording, however, may make a difference in the intermediate-scrutiny calculus because surreptitious recording brings stronger privacy interests into play. *See Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001).

the side of a highway and "observe the issuance of a traffic ticket"). Nothing we have said here immunizes behavior that obstructs or interferes with effective law enforcement or the protection of public safety.

Because the eavesdropping statute is not closely tailored to the government's interest in protecting conversational privacy, we need not decide whether it leaves open adequate alternative channels for this kind of speech (assuming that this factor—an aspect of speech-forum analysis—even applies in this context). *See Saieg v. City of Dearborn,* 641 F.3d 727, 740 (6th Cir. 2011) ("The requirements for a time, place, and manner restriction are conjunctive." (citing *Watchtower Bible & Tract Soc'y v. Village of Stratton*, 536 U.S. 150, 168-69 (2002))). We note, however, that audio and audiovisual recording are uniquely reliable and powerful methods of preserving and disseminating news and information about events that occur in public. Their self-authenticating character makes it highly unlikely that other methods could be considered reasonably adequate substitutes.

Before closing, a brief response to a couple of points in the dissent. Our decision will not, as Judge Posner suggests, "cast[] a shadow over the electronic privacy statutes of other states." Dissent at 54. As we have explained, the Illinois statute is a national outlier. *See* Alderman, *Police Privacy in the iPhone Era?*, *supra* note 4, at 533-45 (collecting state statutes). Most state electronic privacy statutes apply only to *private* conversations; that is, they contain (or are construed to include) an expectation-of-privacy requirement that limits their scope to conversa-

tions that carry a reasonable expectation of privacy. Others apply only to wiretapping, and some ban only surreptitious recording. *Id.* Indeed, the California statute discussed in the dissent is explicitly limited to "confidential communications," a term specifically defined to exclude the kind of communications at issue here. If the Illinois statute contained a similar limitation, the link to the State's privacy justification would be much stronger.

The dissent also takes us to task for giving insufficient consideration to the privacy interests of civilians who communicate with the police and for failing to grasp the extent to which people "say things in public that they don't expect others around them to be listening to, let alone recording for later broadcasting." Dissent at 63. To the contrary, we have acknowledged the importance of conversational privacy and heeded the basic distinction drawn in *Katz* that some conversations in public places implicate privacy and others do not. *See Katz*, 389 U.S. at 351. Again, the privacy interests that may justify banning audio recording are not limited to those that the Fourth Amendment secures against governmental intrusion. But the Illinois eavesdropping statute obliterates the distinction between private and nonprivate by criminalizing *all* nonconsensual audio recording *regardless* of whether the communication is private *in any sense.* 720 ILL. COMP. STAT. 5/14-1(d). If protecting privacy is the justification for this law, then the law must be more closely tailored to serve that interest in order to avoid trampling on speech and press rights.

For these reasons, we conclude that the ACLU has a strong likelihood of success on the merits of its First Amendment claim. The Illinois eavesdropping statute restricts an expressive medium used for the preservation and dissemination of information and ideas. On the factual premises of this case, the statute does not serve the important governmental interest of protecting conversational privacy; applying the statute in the circumstances alleged here is likely unconstitutional.

Accordingly, we reverse and remand with the following instructions: The district court shall reopen the case and allow the amended complaint; enter a preliminary injunction enjoining the State's Attorney from applying the Illinois eavesdropping statute against the ACLU and its employees or agents who openly audio record the audible communications of law-enforcement officers (or others whose communications are incidentally captured) when the officers are engaged in their official duties in public places; and conduct such further proceedings as are consistent with this opinion.

REVERSED AND REMANDED WITH INSTRUCTIONS.

POSNER, *Circuit Judge*, dissenting. The American Civil Liberties Union appeals from the denial of a preliminary injunction in its suit against the Cook County State's Attorney (that is, the "D.A." of Cook County, Illinois) to invalidate the Illinois Eavesdropping Act as a violation of freedom of speech (more precisely, freedom to publish or otherwise disseminate other people's speech). I would affirm the district court.

The Act criminalizes "knowingly and intentionally us[ing] an eavesdropping device for the purpose of hearing or recording all or any part of any conversation" without "the consent of all of the parties to such conversation." 720 ILCS 5/14-2(a)(1). My colleagues have decided to reverse, and to order the entry of a preliminary injunction against enforcement of the Eavesdropping Act. But why a *preliminary* injunction? The opinion gives no indication of what argument or evidence presented on remand might allow the district court again to uphold the Act.

The invalidation of a statute on constitutional grounds should be a rare and solemn judicial act, done with reluctance under compulsion of clear binding precedent or clear constitutional language or—in the absence of those traditional sources of guidance—compelling evidence, or an overwhelming gut feeling, that the statute has intolerable consequences. The law invalidated today is not an outdated one left on the books by legislative inertia, like many of the laws invalidated by the Supreme Court in famous cases such as *Griswold v. Connecticut*, 381 U.S. 479 (1965). In its present form it

dates only from 1994. It is stricter than provisions found in the laws governing electronic eavesdropping in most other states because it requires both parties to consent to a recording of their conversation. Maybe it's too strict in forbidding nonconsensual recording even when done in defense of self or others, as when the participant in a conversation records it in order to create credible evidence of blackmail, threats, other forms of extortion, or other unlawful activity, as in *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011). But that feature of the statute is irrelevant. The ACLU insists on, and the majority opinion endorses, the right to record conversations to which police officers are parties even if *no* party consents to the recording, as long as the officers are performing public duties (as distinct from talking with one another on a private topic) in a public place and speaking loudly enough to be heard by a person who doesn't have special equipment for amplifying sound—in other words, a person standing nearby.

Our ruling casts a shadow over electronic privacy statutes of other states as well, to the extent that they can be interpreted to require the consent of at least one party to a conversation to record it even though the conversation takes place that in a public place, if the conversation could nevertheless reasonably be thought private by the parties. The statutes of several states are so open-ended that they could easily be found invalid under the approach taken in the majority opinion. See Alaska Stat. Ann. § 42.20.310; Ark. Code. Ann. § 5-60-120; Cal. Penal Code § 632(c); Mich. Comp. Laws Ann.

§ 750.539c; N.D. Cent. Code. Ann. § 12.1-15-02. The Cali-
fornia statute is illustrative. It states that "the term 'con-
fidential communication' includes any communica-
tion carried on in circumstances as may reasonably indicate
that any party to the communication desires it to
be confined to the parties thereto, but excludes a com-
munication made in a public gathering or in any legisla-
tive, judicial, executive or administrative proceeding
open to the public, or in any other circumstance in
which the parties to the communication may reasonably
expect that the communication may be overheard or
recorded." The words are clear, the meaning is clear,
but the *application* is unclear. Should a conversation in
a public place, but intended to be private, be thought a
"communication that any party desires to be confined
to the parties"? It is both intended to be private
and remote from a communication made in a "public
gathering," a term that from its placement connotes a
public meeting of some sort. But what of the exclusion
of private communications that the parties "may rea-
sonably expect . . . may be overheard or recorded"? That
fogs the issue of which private communications are
protected. To read the statute literally would exclude
all private communications, for any private communica-
tion *can* be overheard and recorded, even if it is a con-
versation in a closed room.

A number of state privacy statutes tee off from
the statement in *Katz v. United States*, 389 U.S. 347, 351
(1967), that "what a person knowingly exposes to the
public, even in his own home or office, is not a subject of
Fourth Amendment protection. But what he seeks to

preserve as private, even in an area accessible to the public, may be constitutionally protected." See, e.g., Fla. Stat. § 934.02(2); Ohio Rev. Code Ann. § 2933.51(B); Texas Penal Code § 16.02(b)(1), incorporating Tex. Code Crim. P. art. 18.20 § 1(1); cf. 18 U.S.C. § 2510(2). The police in *Katz* had recorded the defendant's phone call, made in a public telephone booth, by secretly fastening a microphone to the booth, and the Court held that the phone call violated the Fourth Amendment because the police had no warrant. Suppose the telephone booth had had no door, or that though it had a door the booth was not soundproof and someone standing five feet away could hear the conversation. Or suppose a police officer is talking in a low voice to a crime victim on a crowded sidewalk; there are people within earshot but the conversants reasonably assume that no one is listening, though they notice someone looking at his cell phone and the recorder in the cell phone might be turned on. We can't predict the impact of today's decision on the laws of most other states.

The ACLU particularly wants to record conversations to which a police officer is a party during demonstrations in public places, such as the march protesting the start of the second Iraq war that was before us in *Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011). That is its particular desire, but if its constitutional argument is correct, anyone has a constitutional right to record all such conversations, not just groups like the ACLU, and journalists, because neither the ACLU nor the press has greater First Amendment rights than other

members of the public. *Citizens United v. Federal Election Commission*, 130 S. Ct. 876, 905-06 (2010); *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938); see generally Eugene Volokh, "Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today," 160 *U. Pa. L. Rev.* 459 (2012). Nor would the right be limited to political demonstrations; it would extend to all audible police conversations in public places, whether outdoors on sidewalks and in parks or indoors in the lobbies or other public spaces of courthouses and other government buildings.

Judges asked to affirm novel "interpretations" of the First Amendment should be mindful that the constitutional right of free speech, as construed nowadays, is nowhere to be found in the Constitution. The relevant provision of the First Amendment merely forbids Congress to abridge free speech, which as understood in the eighteenth century meant freedom only from censorship (that is, suppressing speech, rather than just punishing the speaker after the fact). A speaker could be prosecuted for seditious libel, for blasphemy, and for much other reprobated speech besides, but in a prosecution he would at least have the protection of trial by jury, which he would not have if hauled before a censorship board; and his speech or writing would not have been suppressed, which is what censorship boards do. Protection against censorship was the only protection that the amendment was understood to create. *Patterson v. Colorado*, 205 U.S. 454, 461-62 (1907) (Holmes, J.); *Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1123 (7th Cir. 2001); Akhil Reed Amar, *The Bill of Rights: Creation*

*and Reconstruction* 23-24 (1998); cf. 4 William Blackstone, *Commentaries on the Laws of England* 150-53 (1769).

The limitation of the amendment to Congress, and thus to *federal* restrictions on free speech (the First Amendment does not apply to state action), and to censorship *is* the original understanding. Judges have strayed *so* far from it that further departures should be undertaken with caution. Even today, with the right to free speech expanding in all directions, it remains a partial, a qualified, right. To make it complete would render unconstitutional defamation law, copyright law, trade secret law, and trademark law; tort liability for wiretapping, other electronic eavesdropping, and publicly depicting a person in a "false light"; laws criminalizing the publication of military secrets and the dissemination of child pornography; conspiracy law (thus including much of antitrust law); prohibitions of criminal solicitation, threats and fighting words, securities fraud, and false advertising of quack medical remedies; the regulation of marches, parades, and other demonstrations whatever their objective; limitations on free speech in prisons; laws limiting the televising of judicial proceedings; what little is left of permitted regulation of campaign expenditures; public school disciplining of inflammatory or disruptive student speech; the attorney-client, spousal, and physician-patient privileges in cases in which an attorney or spouse or physician would like to speak but is forbidden by the privilege to do so; laws making medical records confidential; and prohibitions against the public disclosure of jurors' names in cases in which jurors might be harassed. All these legal

restrictions of free speech are permitted (some because they may actually increase the amount of speech, a point I'll come back to). The question in this case is whether a state, to protect both privacy and public safety, should be allowed in addition to forbid the recording of conversations between police officers and members of the public in a public place unless both parties to the conversation consent to being recorded for posterity.

A person who is talking with a police officer on duty may be a suspect whom the officer wants to question; he may be a bystander whom the police are shooing away from the scene of a crime or an accident; he may be an injured person seeking help; he may be a crime victim seeking police intervention; he may be asking for directions; he may be arguing with a police officer over a parking ticket; he may be reporting a traffic accident. In many of these encounters the person conversing with the police officer may be very averse to the conversation's being broadcast on the evening news or blogged throughout the world. In some instances such publicity would violate the tort right of privacy, a conventional exception to freedom of speech as I have noted. *Restatement (Second) of Torts* §§ 652A, 652D (1977) ("unreasonable publicity given to [another person's] private life"); *Wolfe v. Schaefer*, 619 F.3d 782, 784 (7th Cir. 2010); *Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 718-19 (4th Cir. 1991) (en banc) ("publiciz[ing] private facts in a highly offensive manner about an issue not of public concern"); *Miller v. Motorola, Inc.*, 560 N.E.2d 900

(Ill. App. 1990). This body of law is endangered by today's ruling.

Privacy is a social value. And so, of course, is public safety. The constitutional right that the majority creates is likely to impair the ability of police both to extract information relevant to police duties and to communicate effectively with persons whom they speak with in the line of duty. An officer may freeze if he sees a journalist recording a conversation between the officer and a crime suspect, crime victim, or dissatisfied member of the public. He may be concerned when any stranger moves into earshot, or when he sees a recording device (even a cell phone, for modern cell phones are digital audio recorders) in the stranger's hand. To distract police during tense encounters with citizens endangers public safety and undermines effective law enforcement.

The majority opinion disclaims any intention of "immuniz[ing] behavior that obstructs or interferes with effective law enforcement." I am not reassured. A fine line separates "mere" recording of a police-citizen encounter (whether friendly or hostile) from obstructing police operations by distracting the officers and upsetting the citizens they are speaking with. Today's ruling may cause state and federal judicial dockets in Illinois to swell because it will unwittingly encourage police officers to shoo away bystanders, on the authority of cases like *Colten v. Kentucky*, 407 U.S. 104, 109-10 (1972); cf. *City of Houston v. Hill*, 482 U.S. 451, 462 n. 11 (1987); *King v. Ambs*, 519 F.3d 607, 613-15 (6th Cir. 2008), when the

officer wants to have a private conversation in a public place.

That the Eavesdropping Act, despite its name, does not punish the bystander who overhears a conversation without recording it does not have the significance that the majority opinion gives it. There is an important difference, well articulated in Justice Harlan's dissent in *United States v. White*, 401 U.S. 745, 787-89 (1971) (footnotes omitted), between human and mechanical eavesdropping:

> The impact of the practice of third-party bugging, must, I think, be considered such as to undermine that confidence and sense of security in dealing with one another that is characteristic of individual relationships between citizens in a free society. It goes beyond the impact on privacy occasioned by the ordinary type of "informer" investigation . . . . The argument of the plurality opinion, to the effect that it is irrelevant whether secrets are revealed by the mere tattletale or the transistor, ignores the differences occasioned by third-party monitoring and recording which insures full and accurate disclosure of all that is said, free of the possibility of error and oversight that inheres in human reporting.
>
> Authority is hardly required to support the proposition that words would be measured a good deal more carefully and communication inhibited if one suspected his conversations were being transmitted and transcribed. Were third-party bugging a prevalent practice, it might well smother that spontaneity—reflected in frivolous, impetuous, sacrilegious,

> and defiant discourse—that liberates daily life. Much off-hand exchange is easily forgotten and one may count on the obscurity of his remarks, protected by the very fact of a limited audience, and the likelihood that the listener will either overlook or forget what is said, as well as the listener's inability to reformulate a conversation without having to contend with a documented record. All these values are sacrificed by a rule of law that permits official monitoring of private discourse limited only by the need to locate a willing assistant.

The distinction that Justice Harlan drew between an overheard private conversation recalled from memory and one that is recorded is something everyone feels— and feels more acutely in the electronic age than 41 years ago. Walter Kirn, "Little Brother Is Watching," *New York Times Magazine* (Oct. 17, 2010); William Saletan, "Bugged Naked: Webcams, Sex, and the Death of Privacy," *Slate* (Oct. 1, 2010); William Safire, "To Stop the Eavesdrop," *New York Times* (Dec. 20, 1999). Americans face new challenges to privacy because of the amount of personal information stored and publicly accessible online and the ubiquity of recording devices. Lizette Alvarez, "Spring Break Gets Tamer as World Watches Online," *New York Times* (March 16, 2012); Jeffrey Rosen, "The Web Means the End of Forgetting," *New York Times* (July 25, 2010); Jonathan Zittrain, "Privacy 2.0," 2008 *U. Chi. Legal Forum* 65, 81-91. Lacking relevant expertise, lacking evidence, forced back on intuition, judges should hesitate to invalidate legislative attempts to solve these problems.

Police may have no right to privacy in carrying out official duties in public. But the civilians they interact with do. The majority opinion "acknowledge[s] the difference in accuracy and immediacy that an audio recording provides as compared to notes or even silent videos or transcripts" but says that "in terms of the *privacy* interests at stake, the difference is not sufficient to justify criminalizing this particular method of preserving and publishing the public communications of these public officials" (emphasis in original). The assertion lacks a supporting argument, and by describing the recording as a "method of preserving and publishing the public communications of these public officials" neglects the fact that the recording will publish and preserve what the civilians with whom the police are conversing say, not just what the police say. The further statement that these "are not conversations that carry privacy expectations even though uttered in public places" implies that anything said outdoors is *ipso facto* public. Yet people often say things in public that they don't expect others around them to be listening to, let alone recording for later broadcasting, and we are given no reason to think that this is never the case when someone complains to a police officer, or otherwise speaks with one, "in public" in the sense of being in a place in which there are other people about.

Suppose a police detective meets an informant in a park and they sit down on a park bench to talk. A crime reporter sidles up, sits down next to them, takes out his iPhone, and turns on the recorder. The detective and the informant move to the next park bench to continue

their conversation in private. The reporter follows them. Is this what the Constitution privileges?

It is small consolation to be told by the majority that "the ACLU plans to record *openly*, thus giving the police and others notice that they are being recorded" (emphasis in original). All the ACLU means is that it won't try to hide its recorder from the conversants whom it wants to record, though since the typical recorder nowadays is a cell phone it will be hidden in plain view. A person who doesn't want his conservation to be recorded will have to keep a sharp eye out for anyone nearby holding a cell phone, which in many urban settings is almost everyone. The ubiquity of recording devices will increase security concerns by distracting the police.

There is more on the state's side of this case than privacy of communications and the effectiveness of law enforcement—and the more is the same First Amendment interest that the ACLU says it wants to promote. The majority opinion concedes that "conversational privacy" "serves First Amendment interests," but thinks there can be no conversational privacy when the conversation takes place in a public place; it says that "this case has nothing to do with private conversations." But private talk in public places is common, indeed ubiquitous, because most people spend a lot of their time in public places; because they rely on their anonymity and on the limited memory of others to minimize the risk of publication; because public places are (paradoxically) often more private than private places

(imagine if detectives could meet with their informants only in police stations); and because eavesdropping on strangers is actually rather uncommon because it is so difficult in most cases to understand a conversation between strangers. "Anyone who's overheard conversations on the street or in a restaurant knows that conversations between strangers are often unintelligible. There is the public language we employ when talking to strangers and the elliptical private language that we use when talking to people whom we know. Strangers need an interpreter . . . ." *United States v. Curescu*, 674 F.3d 735, 740 (7th Cir. 2012).

I disagree with the majority that "anyone who wishes to speak to police officers in confidence can do so," and "police discussions about matters of national and local security do not take place in public where bystanders are within earshot." Forget national security; the people who most need police assistance and who most want their conversations kept private are often the people least able to delay their conversation until they reach a private place. If a person has been shot or raped or mugged or badly injured in a car accident or has witnessed any of these things happening to someone else, and seeks out a police officer for aid, what sense would it make to tell him he's welcome to trot off to the nearest police station for a cozy private conversation, but that otherwise the First Amendment gives passersby the right to memorialize and publish (on Facebook, on Twitter, on YouTube, on a blog) his agonized plea for help? And as in our informant example, many of the persons whom police want to talk to do not want to be seen visiting police stations.

Accuracy is a social value, and a recording of a conversation provides a more accurate record of the conversation than the recollection of the conversants: more accurate, and also more truthful, since a party to a conversation, including a police officer, may lie about what he heard or said. But on the other side of the balance are the inhibiting effect of nonconsensual recording of conversations on the number and candor of conversations (and hence on values that the First Amendment protects); the baleful effect on privacy; the negative effect on law enforcement; and the litigation likely to be engendered by police officers' shooing away intruders on their private conversations with citizens. These are significant social costs, and the majority opinion offers no basis in fact or history, in theory or practice, in constitutional text or judicial precedent, for weighting them less heavily than the social value of recorded eavesdropping.