# IN THE COURT OF APPEALS OF IOWA

No. 20-1549
Filed May 25, 2022

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**SANTOS RENE TORRES,**
　　　　Defendant-Appellant.
_____

Appeal from the Iowa District Court for Warren County, Brendan Greiner (suppression motion) and Kevin Parker (bench trial), District Associate Judges.

Santos Rene Torres appeals the suppression ruling and his conviction for operating a motor vehicle while intoxicated, second offense, an aggravated misdemeanor. **AFFIRMED.**

Benjamin Bergmann of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

Considered by Vaitheswaran, P.J., and Tabor and May, JJ.

**TABOR, Judge.**

Santos Rene Torres was drinking beer at a local restaurant when he received an upsetting phone call from his wife. She was under arrest for child endangerment. Hearing that unwelcome news, Torres drove home, where he encountered law enforcement in his yard. They would not let him talk to his wife, who was being held in a patrol car. They followed him into his house, where a child protective worker was interviewing the children. The worker asked if he was under the influence. The officers eventually arrested Torres for operating while intoxicated (OWI). He moved to suppress evidence obtained during the encounter, alleging he faced an illegal seizure and custodial interrogation. After the district court denied the suppression motion, he agreed to a trial on the minutes of testimony. The court found him guilty of second-offense OWI.

In this appeal, he challenges the suppression ruling and sufficiency of evidence to prove he was intoxicated. Because the officers did not violate Torres's constitutional rights, we affirm the suppression ruling. And because the State offered substantial evidence of his intoxication, we affirm his conviction.

## I.	*Facts and Prior Proceedings*

Carlisle police were dispatched to Torres's residence after a passersby noticed a six-year-old boy "hanging out of a second story window" with a broken screen. Officer Zach Buehrer arrested the mother, who was caring for three children. The mother called the children's grandmother and their father, Torres. Police called the Iowa Department of Human Services (DHS). The grandmother arrived first. Then child protective worker Kate Roy.

Torres arrived in his truck about fifteen minutes later. Officer Buehrer told him where to park so he would not block traffic. The officer testified that he "had initial thoughts when [Torres] first got there" that he might be under the influence. But the officer said that he was not investigating Torres for OWI after "briefly" talking to him. After he left his truck, Torres walked toward the house. Officer Buehrer testified that Torres was agitated and uncooperative. So the officer followed him from the lawn to the patrol car where his wife was in custody and then back to the lawn. The officer told Torres when he could talk to his wife. The officer also touched Torres's shoulder, saying: "Let's go."[1] Officer Buehrer then trailed Torres into the residence. The officer was neither invited in nor told to stay out. Once inside, Buehrer patted Torres down for weapons and when Torres used the bathroom, the officer waited right outside the door.

Meanwhile in the house, child protective worker Roy interviewed the three children—ages nine, six, and four. About five minutes after arriving, Torres interacted with Roy in the kitchen. During this interaction, Roy noticed that he was blinking slowly, his eyes were bloodshot, and he was leaning forward. She asked if he was "under the influence of anything." As she recalled, Torres did not respond. But Deputy Derek Konrad—who was inside to "assist" with the children—testified that he heard Torres deny that he had been drinking.

When Roy was done speaking with Torres, Konrad "went over to talk with him." The deputy could smell alcohol on Torres's breath and noticed that his eyes

---

[1] At the suppression hearing, defense counsel played a video for the officer to "jog" his recollection about that encounter. But the video exhibit included in the appellate record does not show that footage. Instead, the exhibit available to us starts after Torres leaves the house and is placed under arrest.

were bloodshot and his speech was slurred. The deputy asked Torres to step outside for field sobriety testing. Torres went outside but refused testing. At first, he denied drinking alcohol, but he eventually admitted having two beers at the restaurant before receiving the call that his wife had been arrested. The officers then arrested Torres for OWI, as well as interference with official acts and harassment of a public official.[2]

In a motion to suppress, Torres claimed the State violated his

rights to be free from unreasonable searches and/or seizures as guaranteed by the . . . Federal Constitution and article I, section 8 of the Iowa Constitution . . . by seizing [him] without reasonable articulable suspicion, searching him and his home without probable cause, and interrogating him while he was in custody without a *Miranda* warning.

He sought to exclude "any and all fruits" of that seizure and statements obtained during that custodial interrogation.

The district court denied the suppression motion.[3] Because the officers entered the house without a warrant, the court analyzed two exceptions: exigent circumstances and the community caretaking exception. The court found:

[U]nder these circumstances, it was incumbent upon the officers to remain near the defendant; the defendant was suspected of being intoxicated, responded to a child endangerment investigation, and most importantly, was visibly agitated at the prospect of his children

---

[2] Torres repeatedly called Deputy Konrad a racist and said: "Racist cops like you are why people kill cops." Only the OWI charge is at issue in this appeal.

[3] The court was "not convinced" that Torres had "standing, or a legitimate expectation of privacy, to raise the argument of a warrantless search of the home." The court pointed to filings in which Torres listed a Des Moines address. But because the State conceded that issue, the court decided the motion on its merits.

being removed. In fact, the officers would have been derelict in their duty to leave the defendant unattended in this situation.

The court also ruled that Torres did not face custodial interrogation. The court later convicted Torres of OWI, second offense, following a trial on the minutes of testimony. Torres now appeals.

## II.  Scope and Standards of Review

We review Torres's suppression challenge de novo. *State v. Fogg*, 936 N.W.2d 664, 667 (Iowa 2019). We evaluate the situation facing these peace officers "in light of its unique circumstances." *Id*.

We review his sufficiency claim for legal error. *State v. Leckington*, 713 N.W.2d 208, 213–14 (Iowa 2006). We will uphold the district court's finding of guilt if there is substantial evidence in the record to support the conviction. *State v. McPhillips*, 580 N.W.2d 748, 752 (Iowa 1998). Substantial evidence means a rational factfinder would be convinced of defendant's guilt beyond a reasonable doubt. *Id*. at 752–53. In deciding whether the evidence is substantial, we view the record in the light most favorable to the State and make all reasonable inferences that may fairly be drawn from its proof. *Id*.

## III.  Analysis

### A.  Suppression Motion

### 1.  Fourth Amendment

The Fourth Amendment states,

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable

> cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Our state constitution has a similar provision. *See* Iowa Const. art. I, § 8. Torres does not argue for a distinct analysis under the Iowa Constitution. So we will discuss only the Fourth Amendment. *See State v. Stevens*, 970 N.W.2d 598, 602 (Iowa 2022) ("We decide today's case under the federal [C]onstitution. Although [the defendant] cited both the Iowa and federal [C]onstitutions below, he did not argue for more protection or adoption of a different standard under the Iowa Constitution.").

Torres limits his argument to the question of seizure.[4] A person is "seized" under the Fourth Amendment only if, in considering the totality of circumstances, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). Torres bears the burden to show a seizure occurred. *See Fogg*, 936 N.W.2d at 668. To carry that burden, Torres contends a reasonable person in his position would have believed he was not free to leave "long before the DHS worker noticed he was intoxicated." He then contends his seizure was unreasonable because officers did not have reasonable suspicion or probable cause to believe he was under the influence until after Roy spoke to him inside the house.

The State's position on seizure is less clear. At the suppression hearing, the prosecutor insisted "a seizure of the defendant had not occurred." But on

---

[4] Torres does not seriously dispute the State's position that the officers were allowed to be in the house. Instead, he assumes the validity of that position and argues "the State cannot explain why following Mr. Torres' movements in the house, controlling who he could and could not talk to, and even following him to the bathroom was necessary."

appeal, the State does not engage on the seizure question. Instead, the State argues exigent circumstances justified the officers' actions and no evidence was subject to suppression.

In addressing the seizure issue, we first observe that Torres's encounter with police was atypical. It was not an investigatory stop. *Cf. Terry v. Ohio*, 392 U.S. 1, 32 (1968). In fact, the officers did not initiate the contact. Rather, Torres voluntarily showed up at the scene of a crime involving his child. When he arrived, law enforcement and the DHS were still investigating the child-endangerment offense; police held the mother in custody at the scene. Under those circumstances, it was not unreasonable for the police to exert control over Torres's interaction with his arrested wife. *See Brendlin v. California*, 551 U.S. 249, 258 (2007) (noting that passengers should expect "that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety"); *Am. Civ. Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 607 (7th Cir. 2012) (allowing police to take reasonable steps to maintain safety and control at a crime scene); *see also City of Seattle v. Abercrombie*, 945 P.2d 1132, 1135 (Wash. Ct. App. 1997) ("The ability of police officers to restrict public access to a crime scene serves a significant government interest both in facilitating a thorough investigation and assuring the safety of everyone at the scene, including bystanders, any suspects, and officers."). So even if the officer's contact with Torres outside the home amounted to a seizure, the Fourth Amendment guards against only unreasonable seizures. *See Brendlin*, 551 U.S. at 257 (noting that "a sensible person would not expect the officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or

wrongdoing"). It was reasonable for the officers to restrict Torres's movements while they finished their child-endangerment investigation and before they acquired reasonable suspicion to investigate him for OWI. *See State v. Sparr*, 688 N.W.2d 913, 922 (Neb. Ct. App. 2004).

What's more, Roy had not finished talking to the children inside the house and still needed to interview Torres. Our supreme court has recognized that police "routinely assist" DHS workers who are investigating child endangerment. *State v. Kern*, 831 N.W.2d 149, 156 (Iowa 2013). That caretaking role persists until the children are removed from the home. *Id.* at 174. Here, as they continued to assist the DHS, the officers were free to enter the house where Roy was interviewing the children and then Torres. The mother's arrest did not immediately cut off police access to the place where the crime occurred and witnesses remained. As the district court found, after the agitated father arrived at the scene, police would have been derelict in their duty to leave him alone with the DHS worker. And contrary to Torres's view, the grandmother's presence in the home did not render the officers' continued attention unnecessary. Without police and DHS intervention, the father—even if seriously impaired—would have been left as the custodian of his children after the mother's arrest. So it is fair to say the officers continued to act as community caretakers under the exigent circumstances of the child-endangerment investigation.

True, the United States Supreme Court recently scaled back the community caretaking exception. In *Caniglia v. Strom*, the Court explained that exception was not a "standalone doctrine that justifies warrantless searches and seizures in the home." 141 S. Ct. 1596, 1599 (2021). The Court thus held that police officers

violated Caniglia's Fourth Amendment rights by entering his home without a warrant and seizing his firearms *after* he was taken away in an ambulance for a psychiatric evaluation. *Id.* at 1598–1600. But the Court reiterated "that law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to 'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Id.* at 1599 (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)). As one of the three special concurrences emphasized: "The Fourth Amendment allows officers to enter a home if they have 'an objectively reasonable basis for believing' that such help is needed, and if the officers' actions inside the home are reasonable under the circumstances." *Id.* at 1604 (Kavanaugh, J., concurring). That test is satisfied here. Helping the child protective worker in her mission to secure a stable caregiver for these young children in the wake of their mother's arrest was a legitimate role for the officers. In that role, they acted reasonably in patting down Torres and checking on his sobriety. As our supreme court has recognized, the exigent-circumstances exception was designed for situations presenting a "compelling need for official action and no time to secure a warrant." *State v. Wilson*, 968 N.W.2d 903, 914 (Iowa 2022) (quoting *Lange v. California*, 141 S. Ct. 2011, 2017 (2021)).

As the State explains, the officers did not enter the house to search or seize evidence. Instead, Officer Buehrer followed Torres inside to ensure everyone's safety and Deputy Konrad entered the home to mind the children while Roy spoke to Torres. In the throes of the child-endangerment investigation, that law

enforcement response was prudent and did not violate Torres's rights under the Fourth Amendment. We thus affirm the suppression ruling on that ground.

### 2. Fifth Amendment

We next turn to Torres's contention that he experienced a custodial interrogation without the benefit of the advisory mandated by *Miranda v. Arizona*, 384 U.S. 436 (1966) (safeguarding Fifth Amendment privilege against self-incrimination). First, Torres alleges the officers took him into custody by directing him where to go while outside and by following him into his house. The *Miranda* safeguards apply when "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *State v. Miranda*, 672 N.W.2d 753, 759 (Iowa 2003) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). Second, he suggests that Roy interrogated him by asking if he was under the influence of anything. Interrogation means words or actions by *police officers* that they know or should know would reasonably likely elicit an incriminating response. *See Rhode Island v. Innis*, 446 U.S. 291, 302 (1980).

Both of Torres's claims are faulty. Torres was not in custody to a degree associated with a formal arrest when he voluntarily entered his house to check on his children and to discuss the situation with the child protective worker. And Roy "was not an agent or stalking horse" for the police. *State v. Pearson*, 804 N.W.2d 260, 271 (Iowa 2011). She had her own reasons, as the worker investigating the mother's failure to supervise the children, for speaking to Torres. Her questions to Torres were not a custodial interrogation.

### B.    Substantial Evidence

Suppression issues aside, Torres believes the State offered insufficient evidence of his guilt.  The State charged Torres with operating a motor vehicle "[w]hile under the influence of an alcoholic beverage or other drug or a combination of such substances."  Iowa Code § 321J.2(1)(a).  He does not contest the operation element.  Rather, he argues the State failed to prove that he was under the influence when he drove his pickup to the house.

Proof that a driver was "under the influence" may come in several forms: (1) the driver's reasoning or mental ability has been affected; (2) the driver's judgment is impaired; (3) the driver's emotions are visibly excited; or (4) the driver has, to any extent, lost control of bodily actions or motions.  *See State v. Dominguez*, 482 N.W.2d 390, 392 (Iowa 1992).  Often the State will offer proof of a defendant's erratic driving, but such evidence is not essential to satisfying the under-the-influence element.  *See id.*

Here, the minutes of testimony included Deputy Konrad's narrative report.  The deputy reported overhearing Roy ask Torres if he was under the influence.  During his own discussion with Torres, the deputy noticed bloodshot, watery eyes; slurred speech; and "a heavy odor of alcohol emitting from his person."  Torres also admitted drinking two beers before leaving the restaurant in response to his wife's call.  But Konrad told Torres that based on their interactions he believed Torres was underestimating his consumption.  Torres refused field sobriety testing and the DataMaster test to measure blood alcohol.[5]  He also reacted with hostility

---

[5] Under Iowa Code section 321J.16, his refusal to submit to a chemical test was admissible in the criminal action.  And our supreme court has approved a related

to the officers, threatening them and resisting their efforts to place him under arrest. In finding Torres guilty, the district court noted that Torres "was combative and he was very uncooperative and his emotions were visibly excited."

When considering the evidence in the light most favorable to the State, we find substantial evidence to support the district court's finding that Torres operated a vehicle while intoxicated.

**AFFIRMED.**

May, J., concurs; Vaitheswaran, P.J., partially dissents.

---

jury instruction that allows the factfinder to consider a test refusal in reaching its verdict. *State v. Kilby*, 961 N.W.2d 374, 377 n.4 (Iowa 2021).

**VAITHESWARAN, Presiding Judge** (concurring in part and dissenting in part).

I agree there was substantial evidence to support the district court's determination that Torres operated a motor vehicle while intoxicated. But I would reverse the suppression ruling.

"[P]olice intrusion into the home implicates the very core of the Fourth Amendment to the United States Constitution." *State v. Wilson*, 968 N.W.2d 903, 911 (Iowa 2022). "Because interests in privacy and security in the home are so fundamental, the United States Supreme Court has declared that 'a firm line' is drawn for search and seizure principles at the entrance to the home." *Id.* at 912 (quoting *Payton v. New York*, 445 U.S. 573, 589–90 (1980)). The "firm line" is "not inviolable." *Lange v. California*, 141 S. Ct. 2011, 2018 (2021). "An officer may always enter a home with a proper warrant." *Id.* And there are exceptions to the warrant requirement. *See id.* "But the contours of that or any other warrant exception permitting home entry are 'jealously and carefully drawn,' in keeping with the 'centuries-old principle' that the 'home is entitled to special protection.'" *Id.* (quoting *Georgia v. Randolph*, 547 U.S. 103, 109 (2006)).

The United States Supreme Court recently narrowed those contours. In *Lange*, the Court held "the need to pursue a misdemeanant does not trigger a categorical rule allowing home entry, even absent a law enforcement emergency." *Id.* at 2021–22. The Court continued, "When the nature of the crime, the nature of the flight, and surrounding facts present no such exigency, officers must respect the sanctity of the home—which means that they must get a warrant." *Id.* at 2022. The Court relied on *Welsh v. Wisconsin*, 466 U.S. 740, 742–43 (1984), which limited a warrantless arrest of a person in his home for a minor crime.

The Court also narrowed the contours of the community-caretaking exception to the warrant requirement. In *Caniglia v. Strom*, 141 S. Ct. 1596, 1598–99 (2021), the Court rejected it as a "standalone" exception to the warrant requirement for entry into the home. The Court reasoned, "What is reasonable for vehicles is different from what is reasonable for homes" and underscored that it had "repeatedly 'declined to expand the scope of . . . exceptions to the warrant requirement to permit warrantless entry into the home.'" *Caniglia*, 141 S. Ct. at 1600 (quoting *Collins v. Virginia*, 138 S. Ct. 1663, 1672 (2018)).

Before I address exceptions to the warrant requirement, I will consider the foundational question of whether officers effected a seizure of Torres that implicated the Fourth Amendment. Torres does not limit the scope of his seizure argument to police conduct inside the home. He argues the seizure occurred "as soon as he arrived" and continued on his entry into the home and his use of the bathroom. In the district court, he explicitly challenged every aspect of the officers' interactions with him, thereby preserving error. Accordingly, I will not limit my seizure discussion to the home.

"Whether a 'seizure' occurred is determined by the totality of the circumstances." *State v. Wilkes*, 756 N.W.2d 838, 842 (Iowa 2008). "[F]or a *seizure* to occur, there must be . . . objective indices of police coercion, the element of coercion, or coercive or authoritative behavior." *State v. Fogg*, 936 N.W.2d 664, 669 (Iowa 2019) (internal quotation marks and citation omitted); *State v. Reinders*, 690 N.W.2d 78, 82 (Iowa 2004) ("A seizure occurs when an officer by means of physical force or show of authority in some way restrains the liberty of a citizen.").

When Torres arrived, the mother was secured in a police vehicle and the children's grandmother was attending to them inside the home. Torres came in his truck fifteen minutes after the child protective worker. Although the Carlisle officer testified that he and the deputy sheriff "had initial thoughts when [Torres] first got there" that he might be under the influence, the officer apparently paid no heed to those thoughts and instructed Torres to drive his vehicle to another designated location. *See United States v. Beauchamp*, 659 F.3d 560, 567–68 (6th Cir. 2011) (holding the defendant "was seized when, in compliance with [the officer's] instructions, he stopped, turned around, faced the uniformed officer and the marked patrol car, and began to walk toward the officer" and stating, "[j]ust as '[s]topping after being ordered to stop triggers the Fourth Amendment,' so too does changing course and complying with an officer's requests" (quoting *United States v. Johnson*, 620 F.3d 685, 691 (6th Cir. 2010))).

Torres parked the vehicle where he was told and returned on foot. The officer followed him as he went toward the patrol car and told him when he could talk to his wife. *See Wilson v. Jara*, 866 F. Supp. 2d 1270, 1296 (D.N.M. 2011), *aff'd*, 512 F. App'x 841 (10th Cir. 2013) (finding a seizure occurred when officers ordered a mother who answered her door to "go get your son" even though the mother "was not a suspect," and stating, "[o]fficers seize a person when an officer attempts to assert his or her official authority over a citizen, and the citizen does not feel that he or she is at liberty to disregard that authority"). The Carlisle officer followed Torres into the house. *Cf. State v. Breuer*, 577 N.W.2d 41, 48 (Iowa 1998) (stating a deputy "did not unreasonably invade [the defendant's] legitimate expectation of privacy by opening the unlocked outer door of the apartment

building and proceeding up the stairway to [the defendant's] apartment door without a warrant"). Shortly thereafter, the officer summoned the deputy to come inside. Both officers followed Torres to the bathroom and waited outside the door until he exited. *See United States v. Villa-Gonzalez*, 623 F.3d 526, 532–34 (8th Cir. 2010) (concluding defendant was seized by officers when neither occupant of the home gave the officers consent to enter; "[t]hree officers were present in the trailer" and "[t]he officers . . . positioned themselves so as limit [the occupants'] freedom of movement"). The deputy later questioned Torres about his sobriety and instructed him to go outside for a sobriety check.

The Carlisle officer conceded he began directing Torres "where he could and could not go" from the point of Torres' arrival. *Cf. Brendlin v. California*, 551 U.S. 249, 258, 263 (2007) (stating vehicle occupants' expectation that they would not be allowed to move around at the scene of an investigation supported a determination that they were "seized" and concluding the defendant "was seized from the moment [the driver's] car came to a halt on the side of the road"); *Am. Civ. Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 586, 607 (7th Cir. 2012) (addressing "whether the First Amendment prevents Illinois prosecutors from enforcing the eavesdropping statute against people who openly record police officers performing their official duties in public" and concluding the State's interest in "reduc[ing[ the likelihood of provoking persons during officers' mercurial encounters" was "not threatened"); *City of Seattle v. Abercrombie*, 945 P.2d 1132, 1135 (Wash Ct. App. 1997) (addressing a free-speech challenge to an ordinance and concluding "a violation of the ordinance is triggered only by refusing to comply with an order to leave the scene of an investigation, not by exercising free speech

rights"). The officer expressed no doubt that he demanded Torres speak to him and look at him. He further agreed he told Torres "when he could and could not talk to his wife." He put his hand on Torres three times and told him, "Let's go." He conceded he followed Torres from his lawn to the patrol car and back to his lawn, "never leaving his side." He confirmed the house was "Santos' house," and he agreed he followed Torres into "his home" and Torres did not invite him in. Nor had the mother of the children invited him in prior to her arrest. The officer trailed Torres throughout the house. He then reconnoitered with the deputy outside and both reentered the home. The Carlisle officer agreed he was "still uninvited." As noted, he waited outside the upstairs bathroom until Torres exited. Then, he followed Torres down to the kitchen.

The deputy sheriff similarly agreed the home was "unambiguously" Torres'. He initially "stayed outside" while the Carlisle officer "went inside with [Torres]." When he "went inside," he agreed he "followed [Torres] around his home." He agreed he eventually told Torres to come outside. He acknowledged Torres was not "free to leave" and that would have been at some point before he told him to go outside.

On my de novo review of the record, I would conclude the law enforcement officers "seized" Torres. In my view, the seizure began outside the home and continued with the officers' warrantless entry into Torres' home. I believe the Fourth Amendment protection against warrantless seizures was implicated.

The State concedes "warrants are generally required to search a person's home or his person" but argues exigent circumstances supported the warrantless intrusion. The State suggests a warrant was not required here, given the officers'

suspicion of intoxication, the child-endangerment investigation, and Torres' "visibl[e] agitat[ion] at the prospect of" the removal of his children.

As discussed, the Carlisle officer testified the officers "had initial thoughts" that Torres appeared to be under the influence of alcohol "when he first got there." Yet, neither he nor the deputy investigated their suspicions at that juncture. Indeed, the deputy acknowledged that, when Torres arrived at his home, he was "not investigating him for any offense." And, notwithstanding the officer's suspicion of intoxication, Torres was instructed to drive his vehicle to another location.

As for the child-endangerment investigation, the mother had been arrested and secured in the patrol car by the time Torres arrived. *Cf. State v. Salcedo*, 935 N.W.2d 572, 577 (Iowa 2019) (stating the deputy "failed to obtain individualized suspicion of other criminal activity before unreasonably prolonging the stop. The unreasonableness of the stop was in violation of [the defendant's] Fourth Amendment rights"); *State v. Coleman*, 890 N.W.2d 284, 290 (Iowa 2017) (observing "the lawfulness of the seizure c[a]me to an end" when the "reasonable suspicion for the stop had been completely dispelled"). Although the deputy cited the need to go inside the house to assist with the children, their grandmother was in the home for the express purpose of supervising them. Notably, the Carlisle officer testified he had no concern at that time that the children were unsafe. There also was no evidence that the deputy fulfilled his stated purpose of supervising the children. In sum, the deputy's entry into the home had nothing to do with the children and everything to do with Torres.

It is worth reiterating that no facts tied Torres to the circumstances triggering the mother's arrest for child endangerment. The Carlisle officer reported that he

spoke to Torres about those circumstances and Torres "admitted [the mother] had been having a tough time lately." The officer did not suggest Torres was to blame or mention any exigency relating to the mother's arrest for child endangerment.

Turning to Torres' "visible agitation" at the prospect of the children's removal, I am hard pressed to discern how his understandable distress created an exigency requiring a warrantless, nonconsensual intrusion into his home. *See Wilson*, 968 N.W.2d at 914 (noting "the exigent-circumstances exception was designed for situations presenting 'a compelling need for official action and no time to secure a warrant'" (quoting *Lange*, 141 S. Ct. at 2017)). And most, if not all, the agitation occurred after the deputy expressed an intent to arrest him.

In any event, exigent circumstances for a warrantless entry must be coupled with probable cause for the entry. *See State v. Lewis*, 675 N.W.2d 516, 525 (Iowa 2004) (noting that officers needed probable cause and exigent circumstances to enter the curtilage of a home without a warrant and reasonable suspicion did not suffice). The child protective worker's observations could not furnish that probable cause and be imputed to the officers because she was not a peace officer. *See State v. Werner*, 919 N.W.2d 375, 376 (Iowa 2018) (concluding certain department of transportation officers "lacked authority . . . to engage in general traffic enforcement under Iowa Code chapter 321" (citing *Rilea v. Iowa Dep't of Transp.*, 919 N.W.2d 380, 389 (Iowa 2018)); *State v. Palmer*, 554 N.W.2d 859, 866, 867 (Iowa 1996) (concluding a person "was not a qualified peace officer for purposes of the implied consent statute" and declining to apply imputed knowledge doctrine to a person not qualified as a peace officer). As for the deputy's observations of Torres inside the home, those observations occurred after the warrantless entry

into the home. Finally, the officers' suspicions of intoxication on Torres' arrival at the home were just that—suspicions. They did not amount to probable cause. *See Lewis*, 675 N.W.2d at 525 ("Reasonable and articulable suspicion did not give the officers the authority to enter [the defendant's] fenced yard."). I would conclude the officers' warrantless entry into Torres' home was not supported by the probable-cause/exigent-circumstances exception to the warrant requirement.

I am left with the community-caretaking exception. The State unequivocally concedes that, under *Caniglia*, "the community caretaking doctrine does not apply to warrantless entries into a home." 141 S. Ct. at 1599–1600. But, even if it did, there is scant, if any, evidence that the exception was applicable. The exception "turns on whether the facts available to the officer at the moment of the seizure would have warranted a reasonable person to believe an emergency existed." *State v. Crawford*, 659 N.W.2d 537, 543 (Iowa 2003). As discussed, a reasonable person would not have believed an emergency existed at the time of Torres' seizure. *See Caniglia*, 141 S. Ct. at 1603-04 (Kavanaugh, J., concurring) (recognizing the exigency generated by "need to assist persons who are seriously injured or threatened with such injury" and citing a non-exhaustive list of exigencies, such as contemplated suicide, an elderly man who is "uncharacteristically absent," and "*unattended* young children inside a home" (emphasis added)). I would conclude the exception was inapplicable.

The State argues any error was harmless. *See State v. Lukins*, 846 N.W.2d 902, 912 (Iowa 2014); *State v. McConnelee*, 690 N.W.2d 27, 33 (Iowa 2004). I disagree. Virtually all the evidence cited by the State arose after the officers' warrantless entry into Torres' home. Even if the Carlisle officer suspected Torres

was intoxicated at the moment of his arrival, he cited nothing about Torres' appearance at that moment to support his suspicion and, as noted, he allowed him to reenter his truck and drive to another location. On these facts, I cannot say "the guilty verdict actually rendered . . . was surely unattributable to the error." *McConnelee*, 600 N.W.2d at 33 (citation omitted).

I would conclude the officers' observations of Torres and any admissions he made to consuming alcohol should have been suppressed and any similar observations made by the child protective worker could not be imputed to the officers. I would reverse the suppression ruling and Torres' "judgment of conviction and remand for a new trial" in which the evidence that should have been suppressed "is excluded." *Id.*; *see also Salcedo*, 935 N.W.2d at 581. I would find it unnecessary to discuss whether Torres was subjected to a custodial interrogation without the benefit of *Miranda* warnings.